[L. A. No. 2525. Department Two.—January 6, 1911.]

In the Matter of the Estate of ALICE L. CHEVALLIER, Deceased. MARIE HARTUNG, Contestant and Appellant, v. LOUISE HOLMES, and JAMES F. ELDER, Administrator with the Will Annexed of the Estate of Alice L. Chevallier, Deceased, Contestees and Respondents.

CONTEST OF WILL—JURY TRIAL—NONSUIT MAY BE GRANTED.—Section 1313 of the Code of Civil Procedure, providing that after the impanelment of a jury in the contest of a will, the trial "must be conducted in accordance with the provisions of part two, title eight, chapter four, of this code," authorizes the granting of a motion for a nonsuit in such contest, in a proper case.

ID.—WHEN NONSUIT MAY BE GRANTED.—When once a plaintiff has adduced such evidence as if uncontradicted would justify and sustain a verdict, no amount of contradictory evidence will justify the withdrawal of the case from the jury. If there be sufficient evidence to justify the presentation of the case to the jury and the

CLIX Cal.—11

jury fall into an error in weighing and deciding upon the evidence, the remedy then is by motion for a new trial.

ID.—INSANITY—TESTAMENTARY CAPACITY.—Not every form of insanity, nor every mental departure from the normal, will destroy an otherwise valid testamentary act. The rule is not that no person who is insane may make a valid will, but that the will of no person who, by reason of insanity, is incapable of making valid testamentary disposition shall be upheld.

ID.—FORMS OF INSANITY INVALIDATING WILL.—Insanity that will invalidate a will must be an insanity of one of two forms: either insanity of such broad character as to establish mental incompetency generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination or delusion. In the latter class of cases, the evidence must further establish that the will itself was the creature or product of such hallucination or delusion, or that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument.

ID.—EVIDENCE REVIEWED—NONSUIT PROPERLY GRANTED—INSANITY NOT PROVED.—On a contest of the probate of a will, on the ground of the alleged insanity of the testatrix, the evidence is reviewed and held not to show that the testamentary act was affected in the slightest degree by any or all of the abnormalities attributed to the testatrix, that the evidence of her sound and disposing mind was overwhelming, and that a nonsuit of the contest was properly granted.

ID.—TESTIMONY OF PHYSICIAN AS TO INSANITY.—In such a contest, the granting of the motion for nonsuit was not made erroneous by the mere fact that a physician, in answer to a hypothetical question, expressed his belief that the testatrix was insane, from a medical standpoint, there being no other evidence showing the extent or nature of the insanity.

ID.—SUICIDE AS EVIDENCE OF INSANITY.—The fact that a testator is a suicide may be given in evidence as tending to establish insanity, but standing alone, proof of that fact is insufficient to show a want of testamentary capacity.

ID.—HOLOGRAPHIC WILL—ABBREVIATION OF DATE BY NUMERALS.—The date of an holographic will may be abbreviated and may be expressed in numerals. A date written "4—14—07" is sufficient, and will be construed as meaning April fourteenth, nineteen hundred and seven.

ID.—EVIDENCE OF DECLARATIONS OF TESTATRIX.—On a contest of a will, where the sole issue is that of testamentary capacity, the declarations of the testatrix are admissible, not as evidence of the truth of the statements therein contained, but merely as showing her state of mind and mental condition.

ID.—ACCUSATION OF THEFT—EVIDENCE OF AMOUNT OF PECULATIONS.— Where one of the causes relied on by the contestant as tending to

show that the testatrix was insane, was the fact that she had been accused by her employer with the theft of several hundred dollars a day for several days prior to her discharge from her employment, it was not error to refuse to allow her employer to testify to the amount of such thefts. There being no issue over the truth or falsity of the charge, the exact amount of the alleged peculations was unimportant.

ID.—ADMISSION OF SUICIDE—REJECTION OF EVIDENCE SHOWING.—On such contest, where the fact that the testatrix had committed suicide was substantially admitted, the rejection of a declaration of the beneficiary under the will to that effect, was without prejudice.

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles Monroe, Judge.

The facts are stated in the opinion of the court.

Edwin A. Meserve, for Appellant.

Lawler, Allen, Van Dyke & Jutten, for Respondents.

HENSHAW, J.—This is a contest of a will after probate. The ground of contest is that at the time of the making of the will the testatrix lacked testamentary capacity by reason of insanity. The contestant is Marie Hartung, a sister of the deceased; the contestee is Louise Holmes, another sister of deceased, and the principal beneficiary under the will. The contest was heard before a jury, and at the conclusion of the contestant's case the court granted a nonsuit.

It appeared from the testimony that Alice L. Chevallier at the time of her death was between thirty and thirty-five years of age and unmarried. For the twelve years immediately preceding the thirtieth day of March, 1907, she had been in the employ of the Ville de Paris, a large store in the city of Los Angeles. She had proved trustworthy and competent and had been advanced to the responsible position of collecting the moneys from the cash registers of the store, with their accompanying tags, and turning them in to the treasurer. About six o'clock in the afternoon of the thirtieth of March she was called before certain of the directors and officers of the establishment and was accused of having misappropriated funds which she had collected. She was specifically charged with having taken from two hundred and fifty

dollars to four hundred dollars a day for "several days." She replied coolly and indifferently that she had none of their money, and that if they did not believe it they could search her. She was discharged and returned to the home of her sister, Mrs. Holmes, with whom she was and had been living for several years. She told her sister that she had been accused of theft and discharged. Her sister asked her if she meant to fight the charge, and she replied, "How can I?". Mrs. Holmes then said she could fight heaven and hell if she were innocent, and Miss Chevallier merely smiled. Miss Chevallier remained at home for about a week after this, and then went to a neighboring seaside resort, from which she returned on the evening of April 12th. Mrs. Holmes told her that she had talked with the officials at the store, who had explained to her that Miss Chevallier had been seen to tear up checks and stubs and other vouchers and throw them away, and that the investigations disclosed that she had been taking about two hundred dollars a day. Miss Chevallier replied, "I have not got their money. They have not given me a fair chance." The next morning Mrs. Holmes resumed the conversation with her sister, telling her that the story of her peculations and discharge had spread all over the city; that it was but right that the third sister, Mrs. Hartung, who lived in the neighboring town of Anaheim, should be told; that for the sake of the family and for their dead mother's sake they must do what was right. Miss Chevallier said, "All right, if you think it is right you do what you think is right." Mrs. Holmes replied, "I do think it is right and I will go to Anaheim if you do not." April 14th was Sunday. The two sisters remained at home and saw each other frequently. Miss Chevallier informed her sister that Mr. Durand, the treasurer of the Ville de Paris, was to call and see her during the afternoon, but he did not come. Late in the afternoon Miss Chevallier left the house for a short time, went in the direction of a drug store, was gone about fifteen minutes, and returned with a package wrapped in a white paper. On the morning of the fifteenth Mrs. Holmes carried Miss Chevallier's breakfast to her. She was in bed, and Mrs. Holmes informed her that she was going to Anaheim to tell Mrs. Hartung. She did go to Anaheim. She returned early in the afternoon. Miss Chevallier was still in her room. She

talked to her through the door, though she did not see her. She was asked to deliver a message to Mr. Durand, making an appointment with him for six o'clock that afternoon. Mrs. Holmes delivered the message, and later in the afternoon went to her sister's door and called to her, saying that it was ten minutes after five, and if she meant to keep the appointment at six o'clock it was time for her to dress. Miss Chevallier replied, "All right, I will get right up and be down on time." Miss Chevallier not appearing, the sister again went to the door and called to her. Receiving no response and finding the door locked, she unlocked it and discovered Miss Chevallier kneeling over the bath tub, breathing but unconscious. She had drunk chloroform and possibly had taken laudanum as well. Physicians and trained nurses were immediately called. All the resources of medical science were promptly and continuously employed, but Miss Chevallier never recovered consciousness, and died on the seventeenth day of April. Upon the table by her bed, held down by a paper weight, was the following, wholly in the handwriting of the deceased:

"4-14-07.

"Louise Dear:

"In the safe you will find money enough to cover my burial expenses, you will also find with this note directions for opening same, I would like you to give Grace my black watch & pin also my bracelet, *all* my other effects, personal and otherwise, I leave to you and you alone to keep or dispose of, as you see fit, all my papers are in the German-American Bank vault and in the safe; my accounts are in the Security Savings, American Savings, & 1st Nat'l Banks.

"ALICE L. CHEVALLIER."

This is the instrument which was admitted to probate as a will and over which this contest is waged. The estate which Miss Chevallier left consisted wholly of personal property of the estimated value of twenty thousand dollars. The contestant, Mrs. Hartung, had always been on friendly terms with her deceased sister, but it was with the principal beneficiary under the will, Mrs. Holmes, that Miss Chevallier resided and most intimately associated. Mrs. Hartung's family consisted, beside herself, of her husband and grown son. Her husband was vice-president of one bank, her son a clerk

in another. There is no dispute but that the "Louise Dear" of the testamentary document refers to Mrs. Holmes.

From the evidence it appears that Miss Chevallier was a well-developed, well-nourished woman, whose health, until the latter years of her life, had been extremely good. In 1903 she went to a hospital, where was performed an abdominal operation, doubtless for the removal of a diseased ovary. She returned to her work in due course after the operation, though some time after she again complained of pains in her back, frequently took medicines, declared that she was suffering physically from an affection of the other ovary, and was preparing to undergo another operation for the removal of that ovary, or a cyst upon it. Such was her physical condition at the time of her dismissal from the store. But, by all the testimony, this physical condition neither affected her personal appearance nor her mental characteristics. She continued to do her work efficiently and well. The theory of the contestant is that the history of the case, thus set forth, is sufficient to establish the lack of testamentary capacity which the law requires. The argument addressed to the evidence is that probably by reason of her ovarian troubles and the taking of drugs and medicines her mind became affected; that as evidence of this disordered mind were her peculations of moneys from the firm of which she had been an honest and trusted employee for many years; that no reason, since she was worth twenty thousand dollars, is shown why she should have been tempted to take the money; that her thefts having been discovered, the brooding remorse of an already unbalanced mind impelled her to suicide, and that immediately before destroying herself, and under these circumstances, she wrote the testamentary document from which the law will withhold its approval. In support of this theory the contestant introduced the expert opinion of one alienist who, in answer to a hypothetical question purporting to embody the facts in evidence, declared his belief that Miss Chevallier at the time of the making of the will was insane.

Such being the evidence, appellant contends: 1. That a motion for a nonsuit is not permissible in a contest over the probate of a will; and 2. That, if permissible, still there was such evidence on behalf of the contestant as to make it error for the court to withdraw the case from the considera-

tion of the jury. As to the first proposition, the code itself declares that after the impanelment of a jury in the contest of a will, the trial "must be conducted in accordance with the provisions of part two, title eight, chapter four, of this code." (Code Civ. Proc., sec. 1313.) These provisions contemplate the granting of a nonsuit in proper cases. In *Estate of Morey*, 147 Cal. 495, [82 Pac. 57], it was declared, in a case where a jury had been impaneled in a contest for the revocation of a will, that as the evidence produced by the contestants was not sufficient to justify a verdict in their favor, it was proper for the court in effect to grant a nonsuit by refusing to submit special issues to the jury and ordering the jury discharged. And in *Estate of Dole,* 147 Cal. 188, [81 Pac. 534], in a like action, contesting a will after probate, seeking a revocation of the probate, it was held that the nonsuit there granted was proper, since the evidence adduced by the contestants was wholly insufficient.

The second proposition,—namely, that the evidence was such as to have demanded of the trial court that it deny the motion for a nonsuit and submit the cause to the determination of the jury, presents a more serious question. We approach its consideration with the following declaration of what we regard to be the true rule governing the conduct of a trial judge. The difference between the duties of a judge in granting a nonsuit or directing a verdict is learnedly and historically discussed by Justice Lurton in *Mt. Adams etc. Ry. Co.* v. *Lowery,* 74 Fed. 463, [20 C. C. A. 596]. A reference to that case avoids the necessity of elaborate presentation. It will suffice here to say that, quoting the language of Mr. Justice Barry in *Dublin etc. Railroad Co.* v. *Slattery,* 3 App. Cas. 1155, the guide of the trial court in granting or refusing to grant a motion for a nonsuit, is this: "When once a plaintiff has adduced such evidence as if uncontradicted would justify and sustain a verdict, no amount of contradictory evidence will justify the withdrawal of the case from the jury." If there be sufficient evidence to justify the presentation of the case to the jury and the jury fall into an error in weighing and deciding upon the evidence the remedy then is by motion for a new trial. The distinction is pointed out in *Schuchardt* v. *Allens,* 1 Wall. 359, [17 L. Ed. 642], as follows: "If the evidence be not sufficient to warrant

a recovery, it is the duty of the court to instruct the jury accordingly. This is equivalent to a demurrer to the evidence, and such an instruction ought to be given whenever the evidence is not legally sufficient to serve as the foundation of a verdict of the plaintiff. It is enough that there was evidence upon the subject proper to be left to the consideration of the jury. If the jury erred, the remedy was by a motion for a new trial, and not by a writ of error. This part of the case was argued as if such a motion was before us. The rules of law which would be applicable in that event are very different from those which apply as the case is presented." (See, also, *Byrnes* v. *Moore*, 93 Cal. 393, [29 Pac. 70] ; *Archibald Estate* v. *Matteson*, 5 Cal. App. 441, [90 Pac. 723].)

The matter for consideration thus resolves itself into this: Would the evidence offered by contestant, if presented to the jury, have warranted a verdict in her favor. If so, the court erred in granting the nonsuit, since it was contestant's right in the first instance to have the jury pass upon the issues. If, however, the evidence presented by contestant, viewed in the most favorable light which could logically and legally be brought to bear upon it, would not have supported a verdict in her favor, the court performed its duty in refusing to submit it to the jury.

In considering the evidence it is important, preliminarily, to observe that it is not every form of insanity, not every mental departure from the normal, which destroys an otherwise valid testamentary act. The rule of law is not that no person who is insane may make a valid will, but that the will of no person who, by reason of insanity, is incapable of making valid testamentary disposition shall be upheld. Thus, the wills of aged and infirm people, of people sick in mind as well as in body, are always upheld, if, notwithstanding their enfeeblement, testamentary capacity is shown. So, again, it may be well and perhaps soundly reasoned that all persons who commit crime and that all persons who commit suicide are aberrant, abnormal, and therefore insane. But such is not the insanity which the law has in mind. It must be an insanity of one of two forms, either insanity of such broad character as to establish mental incompetency generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination or delusion.

And, even in the latter class of cases, it would not be sufficient merely to establish that a testator was the victim of some hallucination or delusion to avoid the will. The evidence must go further and establish that the will itself was the creature or product of such hallucination or delusion, or, in other words, that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument. It would thus not be sufficient, to avoid a will, to show that the testator believed that the moon was made of green cheese, but if it should be established, in addition thereto, that because of this belief he devised or bequeathed his property in a way which, saving for the belief, he would not have done, a case is presented where the abnormality of mind has a direct influence upon the testamentary act.

Considering the evidence here in the light of these elementary principles it may be conceded that the testatrix was unquestionably in great distress and agony of mind at the time she wrote her will and that it was written in contemplation of self-destruction. It may be conceded, moreover, that it was abnormal for a trusted employee, in the circumstances of this testatrix, to have suddenly begun a series of thefts, upon so large a scale that discovery could not long be postponed. It may be conceded further that the testatrix's ovarian troubles may have affected her mind and, finally, it may be conceded that in the generality of cases, at least, the normal mind is repelled by the thought of suicide. But all this having been conceded—and no more may be—the evidence still falls far short of showing that the testamentary act was affected in the slightest degree by any or by all of these abnormalities. The positive evidence of a sound and disposing mind is overwhelming. The conduct, manner, actions of the deceased, the language of the will itself, all afford high and uncontradicted evidence of full capacity for the testamentary disposition of property. Nor is it made to appear that, to the slightest degree, the will was the product of any diseased mind or imaginings. She remembers one sister by a gift of a personal memento and to the other, evidently the favored sister with whom for years she had been living, she leaves the rest of her estate. Such disposition, so far from giving evidence of testamentary incapacity, was not even unnatural. There is not in the evidence the slightest

suggestion that the disposition of her property would have
been otherwise if no question of her mental capacity had ever
arisen.  The fact that the testator is a suicide may be given
in evidence as tending to establish insanity, but there must
be much more than the mere fact of suicide to show that
the insanity was so complete as to destroy testamentary
capacity, or that it was of such a nature as to have exercised
a direct influence and bearing upon the testamentary act,
and no word of such evidence appears in this case.  We are
herein not unmindful of the testimony of the physician, who
declares, under the promptings of a hypothetical · question
too long to be repeated, his belief that the deceased was insane.
But his testimony goes no further than this.  This court
recently, in *Estate of Dolbeer*, 149 Cal. 227, [86 Pac. 695],
was called upon to discuss the value of expert opinion evi-
dence given under such circumstances, and declared it to
be, "in the eye of the law of steadily decreasing value."  But
giving to the evidence under the circumstances of the nonsuit,
as we must, the fullest weight to which it is entitled, it is
but a declaration of the belief of the physician that, from a
medical standpoint, she was insane.  It is not accompanied
nor followed by any evidence showing the extent or nature
of the insanity, and, as hereinbefore pointed out, the insanity
which the physician believed he had found, could have well
co-existed with full testamentary capacity.

That the document admitted to probate as a will was of a
testamentary character sufficient to entitle it to probate is be-
yond the need of argument.  Appellant urges, however, that,
being holographic in character, it lacks an essential to a com-
plete holographic will, in that it was not dated.  (Civ. Code,
sec. 1277.)  It will be noted that the date is given as follows:
"4-14-07."  In *Estate of Lakemeyer*, 135 Cal. 28, [87 Am.
St. Rep. 96, 66 Pac. 961], an holographic will bearing the
date "New York, Nov. 22, 97," was involved.  In holding that
the instrument was sufficiently dated within the meaning of
the statute, this court said: "The object of writing is merely
to express the thought or intention of the writer; and this
may be as effectually done by abbreviations or words or other
conventional signs, if commonly used and generally recog-
nized, as by words fully written or spoken. . . . And under
the head of abbreviations are to be included all conventional

expressions or arbitrary signs that have passed into common use." In this language we think the rule is fully and justly expressed, and within it come the numerals here employed. Were the date actually written by the testator in a foreign language it would undoubtedly be good, though it would call for translation and interpretation. By growing usage and custom the method here employed of designating the month, day, and year is so common, that it would be difficult to find one at all versed in business or practical affairs who would not readily construe these numerals to mean April fourteenth, nineteen hundred and seven.

It is contended that the court erred in its rulings upon the reception and rejection of evidence. We have examined each specification with care. They do not require separate discussion. As to some it is sufficient to say that the court very properly ruled, since the sole question was her capacity to make a will by reason of unsoundness of mind, that the declarations of the testatrix should be received and regarded, not as evidence of the truth of the statements therein contained, but merely as showing her state of mind and mental condition. No doubt can be entertained of the soundness of this ruling. (*Estate of McKenna,* 143 Cal. 580, [77 Pac. 461].) The refusal to allow Mr. Durand to testify to the amount of the thefts which an examination of the firm's books and vouchers established was without injury. The only facts pertinent were those which had a bearing upon the condition of the testatrix's mind, and those were that she was charged with the theft of from two hundred to four hundred dollars a day for several days prior to her discharge, and was discharged because of these alleged thefts. No issue was made over the truth or falsity of the charge, and the exact amount of the alleged peculations was unimportant. A witness, Mr. Barry, who was a visitor at the house of Mrs. Holmes after the testatrix had attempted suicide, but while she was still alive, though unconscious, was not allowed to testify to what Mrs. Holmes told him as to the cause of her sister's condition. The evidence might well have been admitted, but its rejection could have worked no possible injury. The cause and manner of the testatrix's death were not in dispute. Mrs. Holmes had testified to it. This witness was admitted to the sick-room where the testatrix lay dying, and it is avowed by appellant

that the evidence which she sought to elicit was that Mrs. Holmes had said that her sister had committed suicide by taking poison, a fact over which throughout the whole contest there was not the slightest question.

No other matters demand specific consideration, and for the foregoing reasons the judgment appealed from is affirmed.

Melvin, J., and Lorigan, J., concurred.