[L. A. No. 7946.  In Bank.—April 2, 1925.]

In the Matter of the Estate of CLARA ANNA PERKINS, Deceased.  MATTIE BELLE FINK et al., Respondents, v. IRVING E. BIGELOW, Appellant.

[1] ESTATES OF DECEASED PERSONS — WILL CONTEST — MENTAL UN-SOUNDNESS—TIME.—It is well settled that, upon the contest of a will on the ground that the deceased was of unsound mind, the actual mental condition of the testator at the time of the execution of the will is the question to be determined, and evidence as to mental condition before or after the execution of the will is important only in so far as it tends to show mental condition at the time of the execution of the will.

[2] ID. — BURDEN OF PROOF — PRESUMPTION. — The presumption is always that a person is sane and the burden is always on the contestants of a will to show affirmatively, and by preponderance of the evidence, that the testator was of unsound mind at the time of the execution of the will.

[3] ID.—TESTAMENTARY DISPOSITION — ABNORMAL MENTALITY.—Every mental departure from the normal will not destroy a testamentary disposition, otherwise valid, but the rule is that the will of a person, who by reason of insanity is incapable of making valid testamentary disposition of his estate, shall not be upheld.

[4] ID.—MENTAL DERANGEMENT—EFFECT ON WILL.—Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) Insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is a victim of some hallucination or delusion, but it must be shown that by reason of the hallucination or delusion the testator devised or bequeathed his property in a way which, except for such hallucination or delusion, he would not have done.

[5] ID.—INSUFFICIENCY OF EVIDENCE.—In this will contest it is held that the conclusion is inescapable that the contestants failed

1.  Testamentary capacity at time of giving instructions for will as affecting measure of capacity at time of execution, note, 2 B. R. C. 41.

Time to which inquiry as to testamentary capacity should be limited, note, 18 Ann. Cas. 905.  See, also, 28 R. C. L. 93.

3.  On the general rules for determining capacity to make a will, notes, 27 L. R. A. (N. S.) 1; L. R. A. 1915A, 445.

4.  Effect of partial insanity on testamentary capacity, note, 41 Am. Rep. 686.

to sustain the burden of establishing the fact that at the time of the execution of the will in question the testatrix was of unsound mind, or that at said time she was subject to delusions which in any manner affected her testamentary act.

[6] ID. — MENTAL CONDITION — TIME. — In a will contest upon the ground of mental unsoundness of the testator the question to be determined is not what might have been the mental condition of the testator, but what in fact was his mental condition at the time that he made the will.

[7] ID.—INSANITY — DISLIKE OF RELATIVES—DELUSIONS.—The fact that a person dislikes his relatives, with or without reason, is not necessarily proof of insanity, and prejudices, dislikes and antipathies, however ill-founded or however strongly entertained, cannot be classed as insane delusions, nor is every delusion an insane delusion.

[8] ID.—TESTAMENTARY CAPACITY—REASONING POWER—PREJUDICES.— Testamentary capacity does not depend upon the testator's ability to reason logically or upon his freedom from prejudice.

[9] ID.—INSANE DELUSION—UNFRIENDLINESS OF RELATIVES.—The fact that the relatives of a testatrix in their own minds held nothing but the most friendly feelings toward the latter will not suffice to warrant the conclusion that because the testatrix believed, mistakenly perhaps, the relatives were in fact unfriendly, she was the victim of an insane delusion.

[10] ID.—RIGHT TO DISPOSE OF PROPERTY—LACK OF GENEROSITY WITH RELATIVES.—The property of a testator is his to dispose of as he wills, and the fact that he does not deal as generously with his relatives as they hope and expect is not proof of insanity.

[11] ID.—UNDUE INFLUENCE — INSUFFICIENCY OF EVIDENCE. — In this will contest on the ground, among others, of undue influence, it is held that there is an utter lack of proof of pressure brought to bear upon the testatrix which overpowered her mind and overcame her volition at the very time the will was made.

[12] ID. — EVIDENCE — TESTIMONY OF ATTORNEY. — In a will contest there is no error in allowing an attorney who had business dealings with the testatrix to testify as to the conversation between

7. Aversion to relatives as affecting capacity to make will, note, 117 Am. St. Rep. 582.

Insane delusion with respect to relative as affecting testamentary capacity, notes, Ann. Cas. 1916C, 4, 29, 33, 35; Ann. Cas. 1918D, 471. See, also, 28 R. C. L. 107.

8. What are insane delusions and effect on competency, note, 63 Am. St. Rep. 80.

11. Undue influence affecting or invalidating will, notes, 16 Am. Dec. 257; 31 Am. St. Rep. 670.

himself and the latter relative to a proposed loan and her appearance at that time, where there was no evidence that he was retained by the testatrix then or at any other time in the capacity of lawyer.

[13] ID. — INTIMATE ACQUAINTANCE — TESTIMONY AS TO SANITY. — Whether or not a witness may testify as an intimate acquaintance as to the sanity of a testator is a question of fact for the trial court to determine, whose discretion is wide, and its determination is not subject to review unless it has abused its discretion.

[14] ID.—CAPACITY TO MAKE WILL—OPINION OF WITNESS.—The capacity of a testator to make a will is a mixed question of law and fact, to be decided by the jury under instructions of the court, and the opinion of a witness upon this question should be excluded.

[15] ID.—HYPOTHETICAL QUESTION—TESTIMONY OF DOCTOR.—In this will contest it is held that there was no error in permitting a doctor to testify as to the mental soundness of the testatrix in response to a hypothetical question framed to meet the views of the contestants.

(1) 40 Cyc., p. 1028, n. 75, 77.   (2) 40 Cyc., p. 1018, n. 1, p. 1020, n. 11.   (3) 40 Cyc. p. 1013, n. 64.   (4) 40 Cyc., p. 1015, n. 76. (5) 40 Cyc., p. 1023, n. 29, p. 1032, n. 3.   (6) 40 Cyc., p. 1028, n. 75.   (7) 40 Cyc., p. 1015, n. 73, p. 1030, n. 87, p. 1032, n. 3. (8) 40 Cyc., p. 1006, n. 8.   (9) 40 Cyc., p. 1014, n. 69.   (10) 40 Cyc., p. 1034, n. 19.   (11) 40 Cyc., p. 1165, n. 87.   (12) 40 Cyc., p. 1025, n. 52.   (13) 40 Cyc., p. 1038, n. 48.   (14) 40 Cyc., p. 1040, n. 50.   (15) 22 C. J., p. 708, n. 26.

APPEAL from a judgment of the Superior Court of Los Angeles County. Frank R. Willis, Judge. Reversed.

The facts are stated in the opinion of the court.

Ticknor, Carter & Webster, Wilton W. Webster and Lincoln B. Backus for Appellant.

Robert Brennan and Miller, Kelly, Shuttleworth & McManus for Respondents.

LENNON, J.—The decedent, Clara Anna Perkins, a widow, whose will is the subject of contest in this proceeding, died on the twenty-sixth day of October, 1922, at Monrovia, California, at the age of about fifty-six years. She left an estate, consisting of real and personal property, appraised, approximately, at $57,000. She left surviving her

a sister, Mattie Belle Fink, and two brothers, Benjamin M.
Bentley, who had been an invalid for some twenty years,
and Frank Bentley. Mattie Belle Fink and Benjamin
M. Bentley are the only contestants. They for many years
lived in the city of Des Moines, Iowa. The decedent for-
merly resided there. She, with her husband, came to Cali-
fornia some ten years prior to her death. Frank G. Bentley,
the noncontesting brother of the decedent, has lived in
California for some twenty-four years. The death of the
decedent was due to aneurism of the descending aorta and
chronic neuritis. She was also a sufferer before her death,
in a moderate degree from nephritis or chronic Bright's dis-
ease.

The decedent by the provisions of her will devised and
bequeathed to Mattie Belle Fink, her sister, $250; to Benja-
min M. Bentley, her brother, $250; to two nieces and a
grandnephew, $250 each; to Frank Bentley, her brother,
$5,000; to the First Church of Christ Scientist of Monrovia,
California, $1,000; to N. C. Carson and his wife of Monrovia,
California, friends of the decedent, a house and lot in Mon-
rovia; to Irving E. Bigelow, Jr., all of the rest and residue
of the estate, which would approximate, after the payment of
the debts of the decedent and funeral expenses, about $30,000.
Irving E. Bigelow, Jr., the proponent of the will in the
court below and appellant here, is a young man whom the
decedent met some two years prior to her death while he
was in military service stationed at the balloon school in
Arcadia, California, and for whom the decedent had de-
veloped a strong attachment.

Upon the issues raised by the opposition to the probate of
the will by Mattie Belle Fink and Benjamin M. Bentley, and
answer thereto, the case was tried, with a jury, and a verdict
rendered in favor of the contestants. The findings of the
jury were to the effect that the decedent at the time of the
making of her will was of unsound mind; that undue in-
fluence was exercised upon the decedent and that her last
will and testament was the product of such undue influence.
From the judgment entered in accordance with this verdict,
Irving J. Bigelow, Jr., named as residuary legatee in the
will of the decedent, appeals.

In support of the appeal and as grounds for a reversal of
the judgment it is urged that (1) the evidence is insufficient

to support the verdict of the jury .that the decedent was of unsound mind at the time of the making of the will; (2) the evidence is insufficient to support the verdict of the jury that the will in question was produced by undue influence; (3) the court erred in overruling objections to the testimony of a witness for the contestants, William B. Brown, an attorney at law, and (4) that the court erred in permitting the witness, Charles L. Allen, over objection, to answer the hypothetical question propounded to him as to the sanity of the decedent.

[1] It is well settled that, upon the contest of a will on the ground that the deceased was of unsound mind, the actual mental condition of the testatrix *at the time of the execution of the will* is the question to be determined (*Estate of Dolbeer,* 149 Cal. 227 [9 Ann. Cas., 795, 86 Pac. 695]; *Estate of Little,* 46 Cal. App. 776 [189 Pac. 818]; *Estate of Casarotti,* 184 Cal. 73 [192 Pac. 1085]). Evidence as to mental condition before or after the execution of the will is important only in so far as it tends to show mental condition at the time of the execution of the will. [2] The presumption is always that a person is sane, and the burden is always upon the contestants of the will to show affirmatively, and by a preponderance of the evidence, that the testatrix was of unsound mind at the time of the execution of the will (*Estate of Dow,* 181 Cal. 106 [183 Pac. 794]; *Estate of Little, supra; Estate of Allen,* 177 Cal. 668 [171 Pac. 686]; *Estate of Casarotti, supra; Estate of Johnson,* 152 Cal. 778 [93 Pac. 1015]; *Estate of Wilson,* 117 Cal. 262 [49 Pac. 172, 711]). Insanity exists as a matter of law only from the time it is shown to exist and proof of subsequent insanity will not create nor carry a presumption of its past existence (*Estate of Dolbeer, supra*).

[3] Every mental departure from the normal will not destroy a testamentary disposition, otherwise valid, of the testatrix' estate. It is not the rule of law that no person who is insane may make a valid will. The real rule is that the will of a person, who by reason of insanity is incapable of making valid testamentary disposition of his estate, shall not be upheld (*Estate of Chevallier,* 159 Cal. 161 [113 Pac. 130]; *Estate of Wasserman,* 170 Cal. 101 [148 Pac. 931]).

[4] Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such

broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. Even in the latter class of cases, it is not sufficient merely to establish that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was the creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument. The evidence must establish, in addition to the fact of the existence of the hallucinations or delusions, the fact that by reason of these hallucinations or delusions the testatrix devised or bequeathed her property in a way which, except for the existence of such delusions, she would not have done. In short, the abnormality of mind must have had a direct influence upon the testamentary act (*Estate of Chevallier, supra; Estate of Collins*, 174 Cal. 663, 670 [164 Pac. 1110]; *Estate of Redfield*, 116 Cal. 637 [48 Pac. 794]; *Estate of Casarotti, supra*).

[5] Applying these principles of law to the instant case, the conclusion is inescapable that the contestants have failed to sustain the burden of establishing the fact that at the time of the execution of the will the testatrix was of unsound mind. It was not shown that the particular form of mental unsoundness with which it is claimed the testatrix was at times afflicted bore directly upon and influenced her testamentary act. Disregarding any conflicting evidence and resolving whatever conflicts there may be in the evidence in favor of, and granting to the contestants every possible inference to be drawn from the evidence, there still remains a hiatus in the chain of proof that at the time of the execution of the will the testatrix was mentally incompetent or that she was at the time subject to delusions which in any manner affected her testamentary act.

Reduced to its real evidential purport the evidence in support of the contestants' claim that, at the time of the execution of the will, the testatrix was of unsound mind may be summed up as follows: Upon the occasion of the visit of testatrix' sister to California four years prior to testatrix' death the sister found that the testatrix' disposition was greatly changed; that she was highly irritable;

the least thing upset her; financially she was extremely close whereas she had previously been very generous. For at least a year prior to her death the testatrix at times suffered severe pain from intermittent attacks of neuritis; sometimes these attacks were so severe as to require a sedative and sometimes they would pass off without the use of any sedative. The sedative consisted of from one-eighth to one-quarter of a grain of morphine and this was never administered more than twice a day. The night preceding the day of the execution of the will, one-fourth of a grain of morphine was administered to the testatrix, but none was administered to her on the morning she executed her will. Her arm was swollen and cramped. At times she would groan and call out in pain. She had on certain occasions a "starey" look in her eyes. At times she was delirious and subject to hallucinations. On one occasion she told her brother Frank Bentley that they were going to Europe and inquired if all of the trunks were packed; on another occasion that they were going to Iowa; and on yet another occasion she insisted that her nightdress was torn, whereas, in fact, it was not. Several days before her death she told the nurse who was in attendance that she was going to be married and asked her to see that no one used the telephone as she wished to call up her bridesmaids. At another time she told the nurse that the pictures had been taken down from the hooks on the wall in order that babies might be hung there. All of these hallucinations, so the testimony shows, occurred some five or six days prior to the signing of the will or some nine or ten days subsequent to the signing of the will. At times during her last illness she would call Frank Bentley "Benny," the name of the other brother. Although she was always suffering more or less, some days she would have a comparatively easy day and would converse and carry on ordinary and usual conversations and would conduct herself in all respects as a normal person. On two occasions, several months prior to her death, the testatrix called to see William Brown, an attorney, upon the feasibility of obtaining a loan of $18,000. Upon those occasions he explained to her that the interest actually amounted to eight and nine per cent; that although in the circular of information on the subject the interest was set out as six per cent, it actually amounted to eight or nine

per cent because she was required to retire the principal in installments. He explained to her that it was a very inadvisable step for her to borrow the money to build bungalows on her property but she seemed "unable to visualize it, or take a preview of the situation." He testified that upon the second visit she made no reference to her former visit but commenced to explain the proposition to him as if he had not already advised her.

On the morning of the execution of the will, a short while after Doctor McKittrick, the attending physician and attesting witness, departed from the house, the attending nurse upon entering the room found the testatrix "clear off." "She was either delirious or something else. She certainly was not all right. She was not quiet. She was talking incoherently." The will was signed by a mark instead of the signature of the testatrix. The testatrix several days after the execution of the will said to Mrs. Frank Bentley, "I have not done right by Frank and Benny. Tell them not to be mad at me. It is just my little joke." Within a day or so previous to October 10, 1922, the day on which the will was signed, the brother, Frank Bentley, had instituted proceedings to have a guardianship appointed for his sister and had had the papers served. Upon being informed by Mr. Backus, the testatrix' attorney, that he and her eastern relatives were provided for, he dropped the proceedings. The testatrix was at the time of her death suffering somewhat from chronic Bright's disease. In answer to a hypothetical question setting forth all of the above-mentioned facts, the testimony of Doctor Charles Allen was, "I don't think she was of sound mind. As to the degree of her irrationality at that particular moment, I don't know; neither would I be prepared to say that she was insane at the moment of signing that will."

The evidence thus outlined does no more than show that the testatrix was mentally distressed and disturbed a short while after the making of the will. It does not show that she was of unsound mind in the legal acceptation of the term at the time of the making of the will (*Estate of Packer,* 164 Cal. 525 [129 Pac. 778]; *Estate of Purcell,* 164 Cal. 300 [128 Pac. 932]). **[6]** And the question to be determined is not what might have been her mental condition, but what in fact was her mental condition at the

time that she made the will (*Estate of Wilson,* 117 Cal. 262, 275 [49 Pac. 172, 711]).

The evidence absolutely fails to establish by sufficient evidence that the testatrix was afflicted with insanity of "such broad character as to establish mental incompetency generally." On the contrary, the evidence is all to the effect that except on the occasions when she was suffering intensely from neuritis she was perfectly normal and rational. It likewise fails to establish the fact that the testatrix was suffering any specific or narrower form of insanity, hallucination, or delusion at the time of the making of the will which had a direct influence on the testamentary act. The evidence is that the hallucinations from which she suffered were in the nature of hallucinations arising from the paroxysms of pain caused by attacks of neuritis. The evidence shows that these attacks were not permanent but only temporary. Moreover, they were not of a character to influence the testamentary act. The hallucination that the testatrix was going on a trip to Iowa; that she was going on a trip to Europe; that there were holes in her nightdress and bedclothing; that she wished the use of the telephone reserved for calling up the bridesmaids for her wedding; that babies were hung on the wall in place of pictures, are obviously but the vagaries of a mind made delirious by the pressure of pain. No possible relationship between these delirious hallucinations and the testatrix' disposition of her property can be traced. The evidence falls short of establishing that such hallucination or delusion existed at the time of the execution of the will or that the will was in the slightest degree the product or offspring of such abnormal condition.

At this point it may not be amiss to note that it is significant that the nurse who was in the room of the testatrix just prior to the execution of the will and must have been in a position to know the condition of the testatrix at that vitally important time failed to testify that the testatrix' condition was in any manner abnormal.

Moreover, the conclusion that the will was executed at a time when the testatrix was in possession of her normal faculties is strongly fortified by the fact that there is in the record proof of a holographic will made more than a year prior to the execution of the will in question, in which she

made much of the same disposition of her property. In a letter written by the testatrix at the time of the making of this holographic will she stated her reasons for making Mr. Bigelow her principal beneficiary to be that had he been her own son she could not have loved him more, and that by reason of his many kindnesses many happy hours had been added to her lonely life.

Contestants, in support of their contention that the testatrix was of unsound mind generally, and at the time of the making of the will, rely chiefly upon the alleged "unwarranted" belief of the testatrix that her relatives were not interested in her and that they would be glad to hear of her death. This belief, it is argued, was an insane delusion, which resulted in an antipathy to her relatives and prompted and influenced her in the making of the will. [7] The fact that a person dislikes his relatives, with or without reason, is not necessarily proof of insanity. As was said in *Estate of Kendricks,* 130 Cal. 360, 364 [62 Pac. 605, 607] : "Prejudices, dislikes, and antipathies, however ill-founded, or however strongly entertained, cannot be classed as insane delusions, nor is every delusion an insane delusion." (See, also, *In re Spencer,* 96 Cal. 448, 452 [31 Pac. 453]; *Estate of Carpenter,* 94 Cal. 406, 417 [29 Pac. 1101].)

Care must be taken to differentiate between mere unreasonable opinions and mental derangements. [8] Testamentary capacity does not depend upon the testatrix' ability to reason logically or upon her freedom from prejudice. A belief may be illogical or preposterous, but it is not, therefore, evidence of insanity (*Estate of Scott,* 128 Cal. 57, 67 [60 Pac. 527]).

The record in the instant case clearly and convincingly shows that this belief as to the lack of cordiality in the relations of herself and her eastern relatives was not a delusion in the usual and legal acceptation of the term. The existence of cordial relations depends upon the attitude of both parties. It may well have been that the sister, Mrs. Fink, entertained none but the most kindly feelings toward her sister. This is not incompatible with the fact that the testatrix may not have reciprocated those feelings. And if she did not, she was justified in her belief that cordial relations did not exist between herself and her sister. Mrs. Fink testified that there was no "serious" difficulty between herself and

her sister. She did testify, however, that the testatrix had wanted the daughter of the witness, who had been raised in testatrix' home in Des Moines, to come and live with the testatrix in California, but that she (the witness) had refused to let her daughter do so because she did not want her daughter to be away from her and it was difficult for her to leave Des Moines. She also testified that she and the testatrix did have some disagreement about the care her mother was receiving. The record also shows that this belief of the testatrix that her sister did not care about her was entertained by the testatrix some six years prior to the making of her will. It was not, therefore, the sudden, inexplicable antipathy of an enfeebled intellect. Evidence introduced by contestants was to the effect that at the time of the existence of the belief the testatrix was a person of strong and vigorous mentality. The fact that Mrs. Fink was justified in not wanting her daughter to come to California has no bearing upon the question of whether or not from that fact the testatrix was justified in believing that her sister cared nothing about her. It often happens that a person thwarted in his desires imputes wrong motives to the one responsible. [9] The fact that the relatives of the testatrix in their own minds held nothing but the most friendly feelings toward the testatrix will not suffice to warrant the conclusion that because the testatrix believed, mistakenly, perhaps, that the relatives were in fact unfriendly, she was the victim of an insane delusion (*Estate of Calef,* 139 Cal. 673, 675 [73 Pac. 539]). If all mistaken beliefs were to be catalogued as delusions, few indeed would escape the stigma of insanity.

Nor does the fact that testatrix left only $250 to her crippled brother in the east, toward whom she never manifested any but the most affectionate regard, tend to show that the will was an unnatural will and the testatrix of unsound mind. The evidence shows that she believed that she had adequately provided for her brother, aside from her will, by selling him the property on which he was living in Des Moines, which she valued at $12,000, for $3,100. In other words, having made other provisions for him, she did not deem it necessary to leave him a large amount in her will. [10] The property of the testatrix was hers to dispose of as she willed, and the fact that she did not deal as gener-

ously with her relatives as they hoped and expected is not proof of insanity.

[11] It will not be necessary to discuss in detail the question of the insufficiency of the evidence to support the finding of undue influence, for the reason that a careful and painstaking search of the record fails to reveal an iota of evidence as to any undue influence in the execution of the will. There is an utter lack of any proof of pressure brought to bear upon the testatrix which overpowered her mind and overcame her volition at the very time the will was made. (*In re Rick's Estate,* 160 Cal. 450 [117 Pac. 532].)

[12] The court did not err in admitting the testimony of the witness for the contestants, William B. Brown, as to the conversation between himself and the testatrix relative to a proposed loan of $18,000 and her appearance at that time. Mr. Brown at the time he saw and talked with the decedent was a lawyer, but there is no testimony that he was retained by the testatrix then or at any other time in that capacity. It is true that he gave her advice, but it was in the nature of business rather than legal advice. Neither did the court err in permitting Brown, as an intimate acquaintance, to qualify as a witness concerning the sanity of the testatrix. [13] Whether or not a witness may testify as an intimate acquaintance is a question of fact for the trial court to determine. That court is vested with a wide discretion, and its determination is not subject to review unless the court has abused its discretion. Such an abuse is not here shown.

[14] The court did err, however, in permitting the witness to give his opinion as to the ability of the testatrix to clearly comprehend the transaction of important business such as the execution of her last will and testament. The effect of the question was to ask the opinion of the nonexpert witness as to the capacity of the testatrix to make a will. The capacity of the testatrix to make a will is a mixed question of law and fact, to be decided by the jury under instructions of the court, and the opinion of the witness upon this question should have been excluded. (*Estate of Taylor,* 92 Cal. 564 [28 Pac. 603]; *Estate of Russell,* 189 Cal. 759, 772 [210 Pac. 249].)

[15] We find no error in the ruling of the trial court permitting in evidence the testimony of Doctor Charles

Allen, who replied, in response to a long hypothetical question framed to meet the views of the contestants, "I don't think she was of sound mind. As to the degree of her irrationality at that particular moment, I don't know; neither would I be prepared to say that she was insane at the moment of signing that will."

The record failing to disclose any substantial evidence that at the time of the execution of the will the testatrix was of unsound mind, or that she was actuated by undue influence, the judgment must be reversed. It is so ordered.

Seawell, J., Shenk, J., Richards, J., Lawlor, J., Waste, J., and Meyers, C. J., concurred.