[Civ. No. 3710. Fourth Dist. Apr. 7, 1948.]

HOBERT JENSEN, as Executor, etc., Respondent, v. ELEANOR JENSEN, Appellant.

Martin C. Thuesen, Iener W. Nielsen and William F. Partlow for Appellant.

Chester E. Shepard, Pauline Davis and Dorsey K. Dwelle for Respondent.

BARNARD, P. J.—This is an action to quiet title to a house and lot in Selma which Mrs. Smith, the deceased, had owned and occupied as a home.

While living in Selma, Mrs. Smith took in and cared for two orphan sisters, Martina Sharp and the defendant Eleanor Jensen, who were some 7 or 8 years old. Martina left when she was about 17 and later became a nurse. Eleanor remained until she was 30, assisting and caring for Mrs. Smith, who moved to Fresno sometime prior to 1938 and bought a house there. In October, 1938, she executed a deed to this property to Martina Sharp, who was then married, telling Martina that she wanted her to see that the property went to Eleanor after Mrs. Smith died. She explained that while Martina was a nurse and had a husband Eleanor would probably never marry and would always need to be cared for. This deed was delivered to Martina, but was never recorded.

In 1942, with the consent and approval of Martina, Mrs. Smith sold the house in Fresno, bought the house here in question and returned to Selma to live in order to be close to her old church. She had had a hip injury which made her quite lame, and for some years she suffered from asthma and a heart condition.

On September 13, 1942, Mrs. Smith made an holographic will, leaving her furniture to Eleanor Jensen, to a stepdaughter, and to her niece Minnie Shirey; $100 each to a stepdaughter and a stepson; and the rest of her property in equal shares to two nephews, to her niece Minnie Shirey, and to Eleanor Jensen, the defendant.

This niece, Minnie Shirey, lived with Mrs. Smith and assisted in caring for her from 1941 until December, 1944. A Mrs. Anderson took care of her from December, 1944, until the latter part of May, 1945. At that time, Mrs. Anderson announced that she was leaving. Mrs. Smith's pastor and Hobert Jensen, the plaintiff, who is the husband of her stepdaughter, attempted without success to get someone to come and care for her. They then took her to the county hospital. The pastor testified that "They took her into the hospital with the understanding that she was a mental condition" and that "the only reason she was placed in the hospital was because we couldn't find any other way of taking care of her." An insanity complaint was signed by Hobert Jensen and she was kept in the psychopathic ward several days. A hearing was had on June 2, 1945. Three doctors reported that she was not insane and the judge who presided at the hearing remarked that she should have a guardian appointed.

On that day, June 2, Hobert Jensen took Mrs. Smith to a rest home in Fresno operated by a Mrs. Johnson. He then filed a petition to be appointed as her guardian. Martina Sharp heard that she was in this rest home and went to see her. Mrs. Smith begged Mrs. Sharp to take her away from this home, saying she wanted to go back to her home in Selma. Mrs. Sharp took Mrs. Smith to her home in Fresno for a few hours several times, returning her to the rest home at night. Mrs. Sharp then talked with Hobert Jensen and the pastor, and they told her that Jensen was going to be appointed guardian and that he intended to sell Mrs. Smith's home in Selma and use the proceeds to support her in a rest home. She reported this to Mrs. Smith who said that they were not going to sell her home, that she was not going to have Jensen for a guardian, and that if they were going to do this she

wanted Mrs. Sharp as guardian. On June 6, 1945, Mrs. Sharp took Mrs. Smith, at her request, to an attorney who had acted for Mrs. Smith at intervals since 1938. On that date, acting on this attorney's advice, Mrs. Smith executed a deed conveying her home to Eleanor Jensen but reserving a life estate. This deed was recorded that day and on the same day a petition was filed in the guardianship proceeding which had already been started asking that Mrs. Sharp be appointed as guardian. This petition contained an allegation that Mrs. Smith had "by reason of old age and ill health, become mentally incompetent to care for or manage her property."

A hearing was had in the guardianship proceeding the next day, June 7, 1945. All that appears in the record is that the judge asked Mrs. Smith if she wanted a guardian appointed and she replied that she did not think she needed one, but if one was to be appointed she wanted Mrs. Sharp. The judge then asked Mrs. Smith how old she was and what her condition of health was. He then said to her that maybe it would be better to have a guardian appointed because of her age and condition of health, and she replied "Well, if one is appointed, I want Martina Sharp to be my guardian." The matter was continued to permit certain notices to be given and on June 28, 1945, the judge signed an order reciting that the matter had come on regularly that day for hearing and that proof had been made, finding that all of the allegations of the petition are true, and appointing Mrs. Sharp as guardian. She did not qualify as guardian because of the early death of Mrs. Smith.

After the first guardianship hearing on June 7, Mrs. Sharp took Mrs. Smith to her home in Selma, having arranged for a woman to care for her. Mrs. Anderson, who was still in Mrs. Smith's home, refused to permit Mrs. Smith to enter. Mrs. Sharp then took Mrs. Smith to her own home in Fresno, where she remained for some 10 days or two weeks, after which she became more seriously ill and was taken to the hospital where she died on July 5, 1945, at the age of 76 years.

After his appointment as executor the plaintiff brought this action as a simple quiet title action with no allegations of fraud or undue influence. The defendant filed an answer and cross-complaint seeking to quiet her own title. At the beginning of the trial plaintiff's attorney stated that the purpose of the action was to show that the deed of June 6, 1945, conveying the property to the defendant was made under undue influence and at a time when Mrs. Smith did not know what she was doing,

and the case was tried on that theory. After proving the appointment of an executor plaintiff's witnesses were asked questions relating to the general situation and mental condition of Mrs. Smith. An objection on the ground that this went to an issue not raised in the pleadings was overruled. No request for a continuance was made and the trial proceeded on that line, with both parties introducing evidence thereon. The case was submitted on briefs and thereafter, by permission of court, an amended complaint to conform to the proof was filed in which it was alleged that Mrs. Smith was the owner of this property during her lifetime and "that on or about the 6th day of June, 1945, the said Kristine Hansen Smith was old, sick, infirm and feeble and was wholly and mentally incompetent to take care of herself or her business transactions and on said day the defendants, fraudulently taking advantage of said mental incapacity of the said Kristine Hansen Smith, procured her to sign a deed of conveyance to said property hereinabove described and the said deed was recorded on the same day, which conveyance was made without any consideration; and the said defendant, Eleanor Jensen, grantee in said deed, claims title and ownership to said property through said conveyance." The court found in favor of the plaintiff and the findings included one which was in essentially the same language as the paragraph just quoted. A decree was entered quieting title to this lot in the plaintiff for the purpose of administration, and this appeal followed.

It is first contended that the court erred in admitting evidence of old age, feebleness, incompetency, fraud and want of consideration at a time when the complaint alleged no fraud or undue influence; that the court erred in admitting evidence with respect to the guardianship proceeding; and that the court erred in allowing an amended complaint to be filed. It is argued that the evidence thus objected to was inadmissible under the pleadings as they then stood, and that an amendment to conform to the proof should not be allowed where the nature of the action is changed and the other party is taken by surprise. While the evidence referred to was probably not admissible under the pleadings as they then stood (*Thompson* v. *Moore,* 8 Cal.2d 367 [65 P.2d 800, 109 A.L.R. 1027]) the appellant was not taken by surprise, asked for no continuance, and met the issue as thus presented. There is nothing to indicate that additional evidence was available to her and in the motion for a new trial, subsequently made and denied, no claim was made that new evidence was available. The case

was tried on the one theory and any error in these matters was cured by the filing of an amended complaint to conform to proof. █ This amended complaint did not set forth a new or different cause of action but set forth facts which were incidental to the action to quiet title. No reversible error appears in connection with these matters.

A more important contention is that the evidence is not sufficient to support the court's findings and judgment; that there is no evidence to support findings of fraud or undue influence on the part of the appellant or anyone else; none to support a finding that Mrs. Smith was at the time in question so mentally incompetent that she did not know what she was doing; that the evidence clearly shows that Mrs. Smith intended to give this property to the appellant and knew what she was doing; and that there was, in fact, some consideration for the transfer in that there was an agreement to pay Mrs. Smith's funeral bill.

The record discloses that a rather strong case was made out by the appellant. That Mrs. Smith should want the property to go to the appellant after her death was most natural since she had raised the appellant and her sister, they had given her great assistance financially and in personal service for many years, and she felt that the appellant would especially need caring for. She had made a deed for that purpose a few years before, at a time when her mental condition is not questioned. That she should again take steps to this end, at this particular time, is also natural in view of her removal from her home and its threatened sale. The evidence that the respondent intended, through the guardianship proceeding he had started, to sell the house and that Mrs. Smith seriously objected to this was in no way contradicted or denied.

Aside from the factual background above set forth, concerning which there is no conflict, certain evidence was received relating to the issue as to whether this deed was procured by fraud and undue influence at a time when Mrs. Smith was so mentally incompetent as not to know what she was doing. On behalf of the appellant, Mrs. Sharp testified that when she saw her at the rest home early in June Mrs. Smith knew where she was and did not want to stay there; that Mrs. Smith told her she wanted to fix it so Eleanor would get this property after she was gone and asked to be taken to the attorney's office; that in this office Mrs. Smith said that Eleanor had been good to her, that she wanted it fixed so Eleanor would get the property, and that ''We girls would

see that she got a decent burial''; that she there asked the witness if she would be her guardian; that a reservation of a life estate was put into the deed to Eleanor because that was what Mrs. Smith wanted; that she was not incompetent at that time; that during the preceding year Mrs. Smith had written to her every week and knew what she was doing; that while Mrs. Smith was in her home the next couple of weeks she knew what she was doing; that during this period Mrs. Smith shelled peas and assisted in other things which she could do sitting down, and engaged in long conversations; and that she paid Mrs. Smith's funeral bills. Mrs. Sharp's husband testified that while Mrs. Smith was at their home she said prayers at table, talked as good as ever, and that she knew what she wanted to do and what she did not want to do.

The attorney who drew the deed on June 6, 1945, testified that Mrs. Smith came to his office with Mrs. Sharp; that he had known her since 1938; that while she was old, walked with a cane and had failed physically, he observed no change in her mentally; that on that day she appeared rational to him; that Mrs. Smith told him of the insanity charge, of the doctor's report thereon, and that a petition for guardianship had been filed; that she told him that she did not want Jensen as guardian because he wanted to sell her property and had caused her to be put in a rest home, that she did not want to stay there, that she did not have long to live and that she wanted to live in her own home in Selma; that she requested him to prepare a deed to the property to Eleanor and hold it until she died, so that no one could be selling the property; that he told her it would be better to deed it outright, retaining a life estate and recording the deed; that she said that this was what she wanted to do; that she told him that she had made a will and he informed her that in spite of that fact she could deed the property; that she told him that she wanted Eleanor to have the property and that Eleanor and Mrs. Sharp had agreed to pay her funeral bills; that Mrs. Smith also told him that the guardianship proceeding was coming up, that she did not want Jensen as guardian and wanted to know if he could stop it; that he told her that the court might appoint a guardian whether she wanted one or not, and that she replied if one was appointed she wanted Mrs. Sharp; that she handed him a slip of paper with a description of the property; that he prepared the deed, reserving a life estate, and she told him she wanted it recorded immediately; that his stenographer inadvertently placed the date on the deed in

the wrong place; that Mrs. Smith called this to his attention and he corrected it in ink (this correction appears in the original deed); that because a guardianship proceeding had been filed he went into the matter carefully because he wanted to make sure that she knew what she was doing; that he was satisfied that she knew what she wanted to do because it was consistent with what she had said over a good many years, and as far back as 1938; that she expressed the same desires and gave the same reasons; that he explained to her that it would be necessary, in preparing a petition for the appointment of Mrs. Sharp as guardian, to put in a statement that she was unable to take care of her own affairs; that she replied that she did not care what was put in so long as she was permitted to live in her own home and no one could take it away from her; that at the hearing in court the next day the attorney for Jensen told the judge that there would be no contest and if Mrs. Smith wanted Mrs. Sharp as her guardian they did not care; that in reply to his questions Mrs. Smith told the judge that she did not want Jensen as her guardian, that she did not think she needed a guardian but that if one was to be appointed she wanted Mrs. Sharp; and that he later prepared the order appointing a guardian, which was signed on June 28. It may be further noted, in this connection, that Mrs. Smith's signature on the deed is remarkably good for a woman of her age and almost as good as her signature on the other deed which was prepared in 1938. Also, that while the judge finally signed an order appointing a guardian he asked Mrs. Smith who she wanted appointed and followed her wishes, although another person had first applied.

The evidence for the respondent on this issue was as follows. The pastor of her church testified that he lived next door to her and saw her often; that from March, 1944, until a guardian was appointed she was gradually deteriorating, both physically and mentally; that his reason for this statement was that at first she was able to go to church but during the last six months of her life she was too feeble to do so; that in March, 1944, he was asked to take care of her finances because her memory failed her, she did not realize what was going on and she lost a check which was found in a place where she had placed it for safe-keeping; that from that time on he handled her business; that all she had was her old-age pension check; that she would indorse the checks each month and he would pay the bills; that she wrote fairly well; that after he took over

her finances she did not seem concerned about it any more; and that he thought she was insane but would not put his judgment against the experts who had found to the contrary. As further reasons for his opinion he testified that whenever he discussed her problems with her she asked no questions, that she was like a child; that she never comprehended; that many times she was incoherent; that at times in the last six months she did not recognize him; that sometimes she did not recognize others who came in until they had been there a while; that Mrs. Shirey had a 2-year-old son and when she left Mrs. Smith complained that she was taking "her boy" away; that after Mrs. Shirey left Mrs. Smith did not realize her own condition and thought she could get along alone all right; and that she was absolutely incompetent after March 31, 1944.

Mrs. Shirey testified that in the last six months she was there Mrs. Smith claimed that the witness' 2-year-old son was hers; that once she hit the boy with her crutch; that on one occasion she did not know Mrs. Shirey; that she could not get her mind on what she was talking about and would say that "I was a mean woman, because I was trying to take her little boy away from her"; that at times she did not recognize people; and that she misplaced money about the house so the pastor was asked to take care of it. Hobert Jensen testified that she was incompetent when he took her to the rest home on June 2; that he did not discuss her business or money matters with her; that he saw her many times in the last six months; and that sometimes she did not know him. Mrs. Johnson testified that when Mrs. Smith was brought to her rest home on June 2, she appeared quite old and in poor physical condition; that she seemed to have no will, no desire, did not care for this or that, did not seem to grasp what was said to her, "maybe she would answer me, maybe she wouldn't"; that she did not know there was a ration book; that she did not ask Mrs. Smith about her property but asked her about her people; and that she did not know that she had any people or who they were and did not know whether Mrs. Sharp and Mr. Jensen were relatives.

Mrs. Smith had just been taken from her home against her will and placed in the rest home. It is not surprising that she was unwilling to talk to Mrs. Johnson or to give her any information. The effect of the pastor's testimony as to her mental condition is largely destroyed by the reasons given for his opinion and by other portions of his own

testimony. That she was forgetful at times may be conceded, and the fact that she had difficulty with her hearing would naturally account for some misunderstanding on the part of others. The only testimony relating to the day on which the deed was executed discloses that she fully understood the existing situation and what she was doing. There is no testimony to the contrary with respect to her condition on that day. The only adverse evidence as to her mental condition related to occasional incidents over a considerable period with no definite times fixed, to matters which were either explained or understandable, or was based on reasons and conclusions which are not too convincing. It is significant also that no medical or expert evidence of her mental incompetency was introduced although it appears that at least three doctors had made a special examination along that line within a few days of the date of the deed. (*Estate of Perkins,* 195 Cal. 699 [235 P. 45].) And the next day after its execution, the judge who heard the guardianship proceeding expressed considerable confidence in her mental condition by allowing her to nominate her own guardian.

No contention was or is made that Mrs. Smith was a person entirely without understanding. It had been found to the contrary four days before the deed was executed, and the evidence would not sustain such a finding if made. While the amended complaint alleged that she was ''wholly and mentally incompetent'' to take care of her business that situation is construed by section 1460 of the Probate Code, providing for the appointment of a guardian in such a case, to mean any person who by reason of old age, weakness of mind or other cause is unable to properly care for his property and by reason thereof is likely to be imposed upon. That allegation of the complaint is coupled with the charge that the appellant fraudulently took advantage of such mental incapacity and procured this deed without consideration. At the outset of the trial it was stated that the purpose of the action was to show that this deed was made under undue influence and when the grantor did not know what she was doing, and the action was tried on that theory.

Aside from the fact that the evidence showed some consideration, in the payment of funeral bills, there is no evidence of fraud or of undue influence beyond the fact that an opportunity therefor existed. ■ Opportunity is not sufficient to raise a presumption of undue influence (*Estate of Smith,* 200 Cal. 152 [252 P. 325]). The order appointing

a guardian was not made until 22 days after the deed was executed and recorded and would not be conclusive as to her mental condition on the date of the deed. Aside from the weakness of the evidence of Mrs. Smith's mental incapacity, as above pointed out, none of that evidence was sufficient to show that she did not know what she was doing when she made the deed. The making of that deed was technically not a testamentary act but it served that purpose here, and similar principles should be applied in determining whether it was valid and whether she had sufficient mental capacity to understand what she was doing in thus providing for the disposition of her property upon her death.

In will cases it has been held that even the fact that one has been adjudged incompetent in a guardianship proceeding does not necessarily establish incapacity to dispose of property by will. (*Estate of Loveland,* 162 Cal. 595 [123 P. 801].) It is well settled that the actual mental condition of the deceased at the time the will was executed is the controlling question, that the presumptions are in favor of validity, and that the burden of proof is always on those asserting invalidity (*Estate of Perkins,* 195 Cal. 699 [235 P. 45]). ''The infirmities of age and lapse of memory are not sufficient in themselves to establish lack of testamentary capacity'' (*Estate of Presho,* 196 Cal. 639 [238 P. 944]).

In *Estate of McDonough,* 200 Cal. 57 [251 P. 916], the court said:

''In considering the question of a testator's competency the rule by which the evidence must be measured is thus stated: '. . . the issue does not rest upon the contestant's evidence alone. The testimony of proponent's witnesses must be taken into consideration in weighing the sufficiency of the contestant's case. Evidence which standing by itself might be sufficient to sustain a verdict may in the light of all the facts be wholly inadequate, and that without invading the province of the jury as the judges of the weight and sufficiency of the evidence.' (*Estate of Casarotti,* 184 Cal. 73 [192 P. 1085].)''

In *Estate of Sexton,* 199 Cal. 759 [251 P. 778], in considering whether there was substantial evidence of mental weakness amounting to incapacity, the court said: ''While a survey of all the facts may warrant a diversity of opinion as to the exact state of her mind and the precise degree of mental capacity retained by her, it is evident that there was not such a complete prostration or alienation of intellect as to

incapacitate her from making a testamentary disposition of her property.''

In our opinion the respondent failed to sustain the burden of proof resting upon him and the evidence is not sufficiently substantial to support the court's findings to the effect that Mrs. Smith was entirely incompetent mentally, that this deed was procured by the appellant's fraud in taking advantage of her mental condition, and that the deed is void. (*Rollins* v. *Smith*, 72 Cal.App. 773 [238 P. 171]; *Estate of Chevallier*, 159 Cal. 161 [113 P. 130]; *Estate of Perkins*, 195 Cal. 699 [235 P. 45]; *Estate of McDaniel*, 77 Cal. App.2d 877 [176 P.2d 952]; *Webb* v. *Saunders*, 79 Cal.App. 2d 863 [181 P.2d 43].)

For the reasons given the judgment is reversed.

Marks, J., and Griffin, J., concurred.