[Civ. No. 2271. Fourth Appellate District.—August 15, 1939.]

In the Matter of the Estate of MARTHA DE GRAAF, Deceased. ELIZABETH VAN DELDEN et al., Appellants, v. KATHERINE CLARK et al., Respondents.

Sharpless Walker for Appellants..

Rutan, Mize & Kroese for Respondents.

BARNARD, P. J.—This is an appeal from an order admitting to probate the will of Martha De Graaf. By this will, dated May 4, 1935, she devised her entire estate, consisting of a half interest in an eight-acre orange grove, to her brother Lambert De Graaf, who died before the death of the testatrix. His widow, now Katherine Clark, filed a petition for the probate of the will, which was contested by the remaining sisters and brother of the deceased.

At the time the will was drawn the testatrix lived on the orange grove with her father and her brother Lambert. Her mother was dead and her two married sisters and her other brother lived elsewhere. Her father was very sick at the time and he died on May 15, 1935. The testatrix had been committed to the Norwalk State Hospital on November 16, 1929, and had been "discharged as improved" on January 12, 1932. Her brother Lambert was appointed guardian of her estate on October 23, 1931, and this guardianship proceeding had not been terminated at the time the will was executed. The testatrix was admitted to the State Hospital at Patton on November 7, 1936, her trouble was diagnosed as dementia praecox, and she continued insane until her death on February 20, 1937.

The most important question raised is whether or not the finding that the testatrix had testamentary capacity at the time the will was executed is sustained by the evidence. The appellants largely rely upon a presumption of unsound mind, arising from the facts that the testatrix had been judicially declared incompetent and had been adjudged insane and committed to an insane asylum. The respondents contend that any such presumption, as well as any direct evidence of incapacity, were sufficiently met by evidence showing her capacity to make a will at the time in question.

The general rule is thus set forth in *Estate of Sexton,* 199 Cal. 759 [251 Pac. 778]:

"The testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, to understand and recollect the nature and situation

of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument.''

■ It is well settled that in such a case as this the mental condition of the testatrix at the time the will was executed is the question to be determined, and evidence as to her mental condition before or after that date is important only as it throws light upon her mental condition at that time. (*Estate of Finkler*, 3 Cal. (2d) 584 [46 Pac. (2d) 149].) In *Estate of Perkins*, 195 Cal. 699 [235 Pac. 45], the court said:

''Every mental departure from the normal will not destroy a testamentary disposition, otherwise valid, of the testatrix' estate. It is not the rule of law that no person who is insane may make a valid will. The real rule is that the will of a person, who by reason of insanity is incapable of making a valid testamentary disposition of his estate, shall not be upheld. (*Estate of Chevallier*, 159 Cal. 161 [113 Pac. 130]; *Estate of Wasserman*, 170 Cal. 101 [148 Pac. 931].)''

■ In addition to the presumptions referred to, the appellants rely upon certain evidence. Several witnesses, including two neighbors of the testatrix, her two sisters, and the husband of one of them, testified to various peculiar actions on her part over a period of years before and after the execution of the will. Among these things were that she did not eat regularly or properly; that she did not dress warmly enough; that on one occasion she did not know how much had been received for oranges from the grove; that she would sometimes pass by the homes of friends without turning her head in that direction; that at times she would not let people in when they called; that sometimes she would leave the house and go into the orchard when callers came; that once when a friend told her that her father was sick and that she had better go and help him she replied that she was sick too; that one witness once found her lying on a mattress on the floor; that she took water with her to her bedroom and sometimes spilled it on the bed; that she once burned a sweater which had been given her; that she would go into the grove and eat oranges and come back with her hands and face dirty and would not wash; that she was very restless at night and on one occasion she said there was a devil in the chicken

house; that on one occasion after the death of her father, when she found that she was disturbing her sister's family at night she took her bed out to the brooder house and refused to come in when it rained; and that in going to the funeral of her brother Lambert, in 1936, she took water with her and threw it out of the automobile window. Several of these witnesses expressed the opinion that on May 4, 1935, the testatrix was not competent to make a will. It is noticeable that most of this evidence refers to incidents which occurred a considerable time before or after the execution of the will, that none of it relates to that day, and that very little of it is closely associated with that day.

The superintendent of the Orange County Hospital testified that he saw the testatrix at the hospital in 1930 or 1931; that she was then insane; that he saw her at the hospital in 1936; that she had been at the hospital in the meantime at intervals of a year; that in 1936 her physical and mental condition had deteriorated; that every time she was in the hospital she was mentally unbalanced; that she had hallucinations and delusions; that her mental malady was dementia praecox; and that this was of a permanent and progressive character. In answer to a hypothetical question he expressed the opinion that on May 4, 1935, she did not have sufficient mental capacity to make a will. Two other doctors, in reply to hypothetical questions, expressed the opinion that the testatrix was insane on May 4, 1935, that she was then incompetent to make a will, and that she then did not have sufficient mental capacity to understand the nature of the act she was doing, to understand and recollect the nature and situation of her property, or to remember and understand her relations to the persons who had claims upon her bounty.

Turning to the evidence on behalf of the respondents a witness, whose home was about two hundred feet from the house in which the testatrix resided, testified that he lived there from 1927 to 1937; that he saw and talked with the testatrix almost daily; that he talked to her frequently just prior to her father's death; that she always knew what she was talking about; that at any time he talked with her she would know what signing a will meant; and that on and about May 4, 1935, she had sufficient mental capacity to know who her relatives were and to know what property

she had. Another witness, who lived across the street from the testatrix' home, testified that she was a registered nurse; that she had lived there about ten years; that she would see the testatrix at frequent intervals when the testatrix was at home; that she was in the testatrix' home occasionally during her father's illness and up to the time of his death; that during her father's sickness the testatrix talked to her about Lambert, saying she felt that he was her only friend; that she did not mention her property except to say that she and Lambert had an interest in the home place; that at her request the testatrix, in April, 1935, signed certain papers for the witness in connection with a loan the witness was getting from the Federal Land Bank; that in the spring of 1936 the testatrix was greatly grieved over the death of her brother Lambert; that she observed Martha's mental condition on the occasion she saw her during her father's illness and preceding his death; that the testatrix was nervous and did not express herself well as she had not a good command of English, but that at all times she knew what she was talking about; that in May, 1935, she would know the nature of a will, she knew that she had an interest in the home there, and knew who her relatives were; that she spoke of Lambert more often than of the others; and that in May, 1935, the witness considered her capable of making a will.

The attorney who drew the will testified that on May 4, 1935, he went into his reception room and saw the testatrix and her brother Lambert; that Lambert told him ''Martha wants to see you about some business''; that he turned to Martha and asked what she wanted and she replied: ''I want to make a will''; that he told Lambert to go around town and attend to his business as he would rather talk to Martha alone; and that Lambert left and he took the testatrix into his office. After talking to her for a minute or two he asked her if her people were not Dutch and she replied ''yes''. He then told her that he had a partner who was Dutch whom he would like to have meet her. He brought in Mr. Kroese and introduced him to the testatrix, saying that Martha would like to make a will and that he would like to have him act as one of the witnesses. He then called in his secretary. While the four were together he asked the testatrix about her relatives and in reply to his questions she told him she had two brothers and two sisters, and told where each one lived. She also gave the

names of the husbands of her sisters. When asked if her father was still living she said he was and gave his first name. When asked how she wanted to make her will she said, "Well, I want to leave everything to Lambert. Father and mother and Lambert and I bought the ranch together and seven years ago father and mother built the house and Lambert has done all the work on the ranch in bringing the trees up and it is just coming into bearing, and Lambert has put more money into the ranch than I have and he bought more of the tools than I did." The attorney then asked her where the ranch was and she said "It's on Hill Avenue". When asked where that was she said, "It is two or three miles from Garden Grove." When asked how big a ranch it was she replied: "Eight acres." When asked if she wanted to leave anything to her other brother or sisters she said: "No, I want to leave it all to Lambert."

While the will was being drawn up the attorney talked to the testatrix "a little while" and also attended to some other work. When the typing was completed Mr. Kroese and the secretary were called in and in their presence the attorney read the will to the testatrix and asked her if she wanted to sign it, to which she replied: "All right." He then told the testatrix this was her will and asked "do you want all three of us to sign as witnesses"? She acquiesced and all three signed the will as witnesses. He further testified that he asked the testatrix "What made you think of drawing a will, Martha?" and she replied: "Well my father is awful sick and I want to make a will." He also asked her if she had any property except the ranch and she said "no". He further testified that in his opinion the testatrix then understood the nature of the act of making a will, that she then understood and recollected the nature and situation of her property and remembered and understood her relationship to her brothers and sisters and father and that, in his opinion, she then had testamentary capacity and understood the manner in which she desired to leave and dispose of her property.

Mr. Kroese and the secretary who typed the will testified to the same general effect as did the attorney who drew the will. Katherine Clark, formerly the wife of Lambert, testified that on the evening of May 4, 1935, she heard the testatrix tell her father that she had been to Santa Ana and made her

will, that she told him that "she had made her will out to Lambert" and that "she seemed to be well pleased over it".

The appellants argue that since the testatrix was adjudged insane in 1929, and a guardian was appointed for her estate in 1931, it must be presumed that her incapacity continued, and that there is no evidence that her condition had improved. Assuming that at one time she had not the capacity to make a will, the evidence last summarized indicates that her mental condition had improved at the time the will was executed. It further appears from the evidence that she was paroled from the Norwalk State Hospital on February 22, 1931, and was "discharged as improved" on January 12, 1932. While the presumptions relied upon by the appellants, and the opinions of the expert witnesses called by them, are sufficient to create a decided conflict with the evidence relied upon by the respondents, it cannot be said as a matter of law that the testatrix lacked testamentary capacity on the day the will was executed. The question was one of fact for the trial court and a part of the evidence sustains the finding thereon.

The appellants argue that the respondents are estopped from contending that the testatrix was in fact competent to make a will because, in 1931, Lambert De Graaf had secured his own appointment as guardian of her estate on the ground that she was unable to properly manage and care for her property, and that he had not been discharged as guardian when the will was executed. The respondents were not parties to that proceeding, any presumption arising from the appointment of a guardian was not conclusive, and the question before the court was the actual condition of the testatrix' mind at the time the will was executed. If she was then competent her will is valid, and no grounds for estoppel appear.

The appellants further contend that the court's finding that there was no undue influence in the making of this will is not supported by the evidence. They rely upon the presumption which arises when it appears that one who unduly profits by a will sustains a confidential relationship with the testator and actively participates in procuring the execution of the will. It is well settled that when this presumption arises the burden of proof rests on the proponents of the will to overcome the presumption. (*Estate of Lepori,* 4 Cal. App. (2d) 761 [41 Pac. (2d) 970]; *Estate of Lances,* 216

Cal. 397 [14 Pac. (2d) 768].) ██ It is argued that such a presumption existed here since Lambert De Graaf, the brother of the testatrix and the guardian of her estate, procured the making of the will in his favor. Assuming that such a presumption existed here it cannot be said that the burden of proof resting upon the respondents was not sustained, and that the evidence was not sufficient to support the court's finding that, in fact, there was no undue influence. There is no evidence that Lambert De Graaf procured the execution of the will or participated in its execution other than the fact that he accompanied the testatrix to the office of the attorney who drew the will, who was also the attorney for Lambert as the guardian of her estate. This attorney testified that while he had acted as attorney for Lambert from the beginning of the guardianship proceedings he had not seen him on any business for two or three years prior to the date on which the will was executed. When the testatrix and her brother Lambert appeared at the office of the attorney on the day the will was drawn the attorney requested Lambert to leave, saying he desired to talk to the testatrix alone. He did this and later talked with her in the presence of his partner and his secretary, before the will was drawn. He talked with her again while the will was being typed. All of this evidence, if believed, indicates that no attempt was made to influence the testatrix with respect to the disposition of her property, and that the making of the will in favor of her brother Lambert was in accordance with her own wishes and desires. In commenting upon this evidence the trial court, after pointing out that the bringing of the testatrix to the attorney's office by the brother who was guardian of her estate was a suspicious circumstance, stated that the attorney had observed extreme caution in order to satisfy his mind that the testatrix was competent, that he had taken unusual precaution to satisfy himself, his partner and his secretary that the testatrix was acting freely and voluntarily and without any influence whatsoever, and further stated that he was convinced that these things had all occurred, and that "the presumption arising from the suspicious circumstance has been repelled by those facts". This also was a question of fact for the court and the evidence sustains his finding and conclusion.

■ The appellant assigns as error the sustaining of an objection to the question asked of a certain witness, "Have you formed any opinion in your mind whether on May 4th, 1935, she was competent to make a will?" While it is true that no attempt had previously been made to ascertain whether this witness knew the necessary requirements of testamentary capacity, we think the witness should have been allowed to answer the question and that the sustaining of the objection thereto was error. This error is not sufficient, however, to justify a reversal. The witness had previously testified to a number of facts which she very evidently regarded as sufficient to show that the testatrix was insane. This was a part of a long line of testimony from various witnesses, many of whom were permitted to answer questions similar to that to which the objection was sustained. There was no jury and the reasons for any such opinion on the part of the witness would weigh much more with the court than the mere expression of the opinion. In view of the entire evidence, shown by the record, it cannot reasonably be supposed that the obvious answer to the question could have added any weight to the witness' testimony or have affected the result.

■ The appellants contend that their motion for a new trial should have been granted because it appears from the affidavits of two physicians that their testimony "would have with reasonable certainty changed the result on a new trial". The appellants concede that this evidence could, with reasonable diligence, have been discovered prior to the trial. It further appears that practically all of the evidence thus sought to be obtained on a new trial was cumulative, that one of these physicians never saw the testatrix until about November 1, 1936, a year and a half after the will was executed, and that the other had not seen her since January, 1932. No error appears in this connection.

The order appealed from is affirmed.

Griffin, J., and Haines, J., *pro tem.*, concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 9, 1939.