246 P.2d 1063

**In re O'CONNOR'S ESTATE.**

**KELSEY v. CAMERON et al.**

**No. 5374.**

Supreme Court of Arizona.

July 14, 1952.

Frank J. Barry, Jr., James V. Robins, Nogales, for appellant.

Nasib Karam, Nogales, for appellees.

PHELPS, Justice.

This case involves two appeals, one from the order and judgment of the trial court adjudging the will of Emma M. O'Connor, deceased to be invalid upon the ground (1) that she was mentally incompetent to execute the will on the date of its execution; and (2) that it was executed as the result of undue influence being exercised upon the deceased by Harry W. Kelsey, sole beneficiary under the will. The second appeal is from the order of the trial court appointing a general administrator of the estate of said deceased during the pendency of the will contest, upon the ground that

the court was without jurisdiction to make such appointment, and that said appointment is therefore null and void.

The facts are that deceased was the surviving spouse of Judge W. A. O'Connor who died in 1933. She and Judge O'Connor were married in 1901. Kelsey married Nellie Walker, sister of Mrs. O'Connor, in 1902. The Kelseys acted as best man and bridesmaid respectively for the O'Connors and the O'Connors acted in the same capacity for the Kelseys when they were married.

The O'Connors and Kelseys were very close in their family ties. Nellie Kelsey died in 1915. At the time of her death the Kelseys owned the home now belonging to the estate of the deceased. At that time Kelsey stated to the O'Connors he could never live in the house again. He then turned the keys over to them and later conveyed the property to the O'Connors as a gift subject to a mortgage in the sum of $3,250 which the O'Connors paid.

During the life of Judge O'Connor both he and the deceased frequently stated to many of their friends who testified at the trial in this case, that they (the O'Connors) wanted Kelsey or Kelsey and Edith, his second wife, to have the property here involved upon the demise of the O'Connors. They also made this fact known to the Kelseys on many occasions. After Judge O'Connor's death, Mrs. O'Connor continued throughout her life to express the same desire and intention both to the Kelseys and to her friends, stating in connection there-with, that it was the wish or desire of her husband also that the Kelseys should have the property. After Judge O'Connor's death the Kelseys took care of all of Mrs. O'Connor's business including the performance of minute errands. Mrs. O'Connor trusted Mr. Kelsey implicitly and relied upon him to look after her affairs and her confidence was not misplaced. There is no question but that the relation between them was fiduciary in character. Mrs. O'Connor procrastinated grievously in attempting to carry out her oft-expressed desire and intention of herself and Judge O'Connor that the home property should go back to Kelsey.

The deceased kept the vacant rooms of her home rented which furnished her a small income. Among those who occupied a room in the home was a school teacher by the name of Engleman who during his four years residence in the home, became quite friendly with Mrs. O'Connor and was much interested in her welfare. When the school term ended in May 1947 he told the Kelseys and Gladys Cameron, a niece of Mrs. O'Connor and one of the appellees herein, that in his opinion Mrs. O'Connor, who was then about 80 years old, should not be left in the home alone. The evidence disclosed that Mrs. O'Connor was afraid and kept her doors securely locked even when the rooms were full of occupants. The nieces and nephews could not or did not do anything about the matter and the Kelseys went over and slept in the home of Mrs. O'Connor at night from May 23, 1947,

until the last week in August. They would return to their own home in the morning and after preparing and serving their breakfast Mrs. Kelsey would return to the O'Connor home and perform housework for Mrs. O'Connor until 12 o'clock each day and on some occasions would remain as late as one, two or three o'clock in the afternoon. During the last week in August 1947, pursuant to a verbal arrangement with Mrs. O'Connor, the Kelseys moved into the O'Connor home and lived there continuously thereafter until the death of Mrs. O'Connor in March 1948.

Mrs. O'Connor became seriously ill on December 3, 1947, and never fully recovered from such illness. She would get better at times but the improvement was only temporary. She was in bed most of the time after December 3 but would frequently get up for her meals until a couple of weeks before her death. Mr. Kelsey testified he never at any time requested Mrs. O'Connor to will her property to him but said that on December 15, 1947 she "was eating breakfast and I was having a cup of coffee with her, I had had my breakfast. She had always called me Kelse. She said, 'Kelse, I think I am going to die * * *'" and asked him if he wanted her to make a will. He asked her in turn if she wanted him to have her property and upon her answer in the affirmative, he then said "I want you to make a will."

On the same date, upon request of deceased, Kelsey went to the office of Honorable Duane Bird to convey Mrs. O'Connor's request to him to come to her home for the purpose of making the will. Mr. Bird had been Mrs. O'Connor's attorney for many years but he was out of town and Mr. Kelsey went to the office of the Honorable Frank J. Barry, another prominent Nogales attorney, and succeeded in persuading him to draw the will. Mr. Kelsey told Attorney Barry that Mrs. O'Connor wanted all of her property to go to him. Without consulting Mrs. O'Connor, Barry drew the will accordingly and on the following morning, after having made arrangements through Kelsey for witnesses, he took the will to her home for her execution.

Mr. Barry testified at the trial that immediately upon returning to his office he made a note or memorandum of his conversation with Mrs. O'Connor at the time he presented the will to her for her signature and proceeded to testify from his notes. He said:

"* * *. I told her that Mr. Kelsey had informed me she wanted to make a will and he stated she was to leave everything to him, and I asked her if she could read it, that I had the will with me, and she took the will and she looked at it, and said 'Do you want me to read it aloud?' and I said 'Yes, that would be a good idea,' and she began to read it clearly and distinctly. I was rather surprised she could read so well, and she began to read until she came

down to the first clause, and she halted after reading it.

"Q. Will you read the first clause so that the jury will know? A. (Reads) 'Having in mind that my deceased husband, William A. O'Connor, on many occasions expressed a wish that at the time of my death all property then owned by me should go to Harry W. Kelsey, who was the husband of my deceased sister, Nellie Walker Kelsey, and who has always been kind and good to me, I give, devise and bequeath all that I die possessed of to said Harry W. Kelsey.'

"Q. What did she say after she read that? A. She stopped when she came to that clause which referred to the leaving of the property to Harry Kelsey and said 'I don't understand that. I don't remember that. You know I have a sister Nellie.' And then I said to her, 'Don't you know that your sister Nellie has been dead for many years?' and she said, 'No, I do not.' I said 'Oh, yes, she has. I can get her death certificate for you from Phoenix in a few days.' She said 'But I don't want to put you to that trouble.' I said 'Don't you remember she had an unusual disease called pellagra, and that she died many years ago?' and she said 'Yes, I think I remember now. She was the wife of Harry W. Kelsey, as it says here. Ever since the death of Mr. O'Connor, Mr. Kelsey has been like a brother to me. I remember now Mr. O'Connor said everything should go to Mr. Kelsey because we owed a lot to him. He was very good to us. My husband said it would not amount to much, anyway.

\*　　\*　　\*　　\*　　\*　　\*

"A. Then she continued reading the will, and when she came to Clause 2—

"Q. Will you read this? A. (Reads) 'In making this will I have in mind the children of my deceased brothers, William H. Walker, Harvey S. Walker, and Robert Walker, but to said children I do not leave anything for the reason above given.' When she read that clause she said 'Why, they don't need any help. They are all grown up.' I said to her then, 'Mrs. O'Connor, I knew your husband very well and regarded him as one of my closest friends. I certainly would not want to influence his widow to do anything she didn't want to do. Now you can keep this will and read it over, and if it is not what you want to do, don't sign it, but while I don't want to urge you to make your will I would suggest that you do so. If this will is not satisfactory tell me what you want, to whom you wish your property to go, or call in some other lawyer and have him prepare a will according to your wishes.' She said 'I don't understand anything about business. My husband always took care of anything.' I said 'Do you want to talk to Harry? If

you do I will call him in, and I will come back later, if you want me, or I will wait here a few minutes if you want me.' and she said 'I don't want to detain you,' and I said 'I will stay,' and I went out where Mr. Kelsey was and said Mrs. O'Connor wanted to talk to him, and while he was in the room I engaged in conversation with Mr. and Mrs. Macgregor. My best estimate is that Mr. Kelsey was in Mrs. O'Connor's room for about ten minutes; it was not long. When he came out of her room Mr. Kelsey told me to go in and see her. When I went in I was curious to find out whether she was agitated or disturbed, but she was not. She was perfectly calm and self-possessed, just as I had left her. I was convinced she was perfectly able to make her will. She spoke clearly and intelligently. Outside of the forepart of my interview, that is, before she spoke to Mr. Kelsey, and she mentioned she had a living sister, I would not have the slightest doubt as to her mental capacity. Her subsequent admission that Nellie was dead seemed to be the result of recalling that Nellie had pellagra and died. She was holding the will in her hand when I returned, and she said 'This is all right. This is what I want to do.' I said 'Are you sure, now, this is what you want to do, because you must not do anything contrary to your own wish?

This is to be your own will and not what anyone else may want.' She said 'Yes, I understand. I want my property to go this way. I want to do it this way.' I said 'All right. I will call in the witnesses, and I called Mr. and Mrs. Macgregor into the room. Mrs. Macgregor greeted her affectionately and stooped over and kissed her. They talked jokingly of her jumping about and she replied she had not jumped about very much but she had been out of bed that morning. I then said 'What is that paper you have in your hand?' She replied 'This is my will.' I asked 'Do you want Mr. and Mrs. Macgregor to sign it as witnesses?' She said she did, and I then asked her 'Is this will the way you want your property to go? and she said 'This is the way I want it,' and she then signed the will and Mr. and Mrs. Macgregor signed it. As I was folding the will up I asked her 'Did anyone prevail on you, Mrs. O'Connor, to make this will?' She answered 'No. That is the way I want it.' I then asked, 'Do you want me to give this (meaning the will) to Mr. Kelsey?' She said 'Yes.' She did not appear to have overexerted herself. She was still calm and self-possessed. She continued cheerfully talking to Mr. and Mrs. Macgregor as I left the room and delivered the will to Mr. Kelsey, * * *."

Mrs. Pearl Macgregor who witnessed the will testified that when she went in to sign the will she asked her,

"* * * Emma, is this the way you really want it?' and she said 'Yes, that is the way I want it. I hope it is fixed all right so they won't have any trouble.' * * * That was while we were in the room alone. * * * She said 'Well, don't say anything about it. We just won't talk about it.' * * * She signed quickly and her hand seemed steady. She also remarked that she was glad she had done it, she had been wanting to do it for a long time. * * * She said she had been trying to get him (Duane Bird) to make out some papers for her but he is always so busy."

During her visit with Mrs. O'Connor after she signed the will Mrs. O'Connor was asking about the wife of Mrs. Macgregor's youngest son of whom she was very fond. The remainder of the conversation was casual and she was calm and composed during the visit. Mrs. Macgregor further testified that

"* * * * she said she was so glad that Mr. Barry had come in, he was an old friend of theirs, and he had taken care of this for her. She said Mr. O'Connor had been a friend of Mr. Barry."

Then she stated that when Mr. Macgregor came in and told her "I think we better go now" he commented on the picture of Judge O'Connor hanging at the left of the door as they were going out and she (Mrs. O'Connor) said "Yes, that is a very good likeness. I think he is around the house somewhere." Mrs. Macgregor further stated that deceased had spoken to her many times of Judge O'Connor's death but never made any statement concerning his being alive until after August of 1947. She had belonged to the Wednesday Card Club with Mrs. O'Connor for many years and was frequently thrown with her. She played bridge with Mrs. O'Connor in 1946 and the latter played very intelligently. She never at any time heard Mrs. O'Connor refer to her sister Nellie as being then alive. She stated Mrs. O'Connor had moments when she was not lucid but she had more lucid moments than otherwise.

Mrs. Macgregor estimated that Mr. Kelsey did not remain in Mrs. O'Connor's room over two minutes at the time he was requested by Mr. Barry to go in to see Mrs. O'Connor. Kelsey testified to the following conversation with Mrs. O'Connor on that occasion:

"She had the will in her hand and she said 'Do you want me to sign this?' and I said, 'Emma, have you read it?' and she said 'Yes,' and I said 'And you want to give the property to me?' 'Yes.' and I said 'Go ahead and sign it.'"

W. J. Macgregor who witnessed the will and who had known Mrs. O'Connor for years testified that she looked bright and

alert and that he believed her to be perfectly normal at the time she signed the will.

Mrs. Milliken who had belonged to the card club with Mrs. O'Connor for 23 years testified that Mrs. O'Connor never talked to her about Judge O'Connor as being alive in 1946 but did in the fall of 1947. She stated she saw Mrs. O'Connor nearly every day from October 1947 until her death in March, 1948. She stated she never saw Mrs. O'Connor during the morning that she was not lucid but she seemed tired in the evenings. She stated "In the morning she was as bright as I am right now." She further testified that Mrs. O'Connor had talked to her since the time that her brother Harvey was ill in the O'Connor home about her relatives and expressly stated that she did not intend that the sons of Harvey should receive anything from her estate and that the children of her brother Rob were well fixed, that their father had set them up in business and that she did not intend that they should receive anything and she expressed a dislike for Gladys Walker Cameron and indicated that she would not leave anything to her. She did not mention Virgil's name. She said that Mrs. O'Connor stated to her just before the Kelseys moved into the O'Connor home that she wished they would hurry up and come, and when asked:

"Q. What exactly did she say with respect to leaving the property to Mr. and Mrs. Kelsey? A. She said she wished Duane would hurry up and get that all straightened up so she could leave that to the Kelseys."

Just after Harvey's death on an occasion when Mrs. Milliken was at her home, Mrs. Milliken testified:

"* * * She was crying over the way Crandall was treating her and she said she must get her affairs straightened out so as to leave that property to Mr. and Mrs. Kelsey. It had always been Mr. O'Connor's wish to have it that way and it was her wish."

She said that:

"* * * she didn't have any use for him the way he had treated her and that nothing was to go to him. She said Reese had been nice to her but didn't need anything from her because he was able to take care of himself."

Mrs. Marie Hudgin, an intimate friend of long standing who visited her frequently, testified that the last time she was at the O'Connor home was two or three months before Mrs. O'Connor died. She said Mrs. O'Connor followed her out to the car and said "Marie, I don't like to see you leave." She stated she never heard her make a statement that indicated she was insane or out of her head.

Mrs. Mary Welty, a school teacher, who had known Mrs. O'Connor since the early 1930's, drove her and Mrs. Kelsey across the Border to Elvira's three or four times in the early fall before leaving for school

in September, 1947. She next saw her on or about December 18 at her home, the last thing she did before leaving on her Christmas vacation. She was sitting up in bed. There was nothing in her conversation to indicate she was not in her right mind. Again on February 21, 1948, she said she was at the O'Connor home at Mrs. Kelsey's birthday dinner. Mrs. O'Connor got up and ate at the table. When she saw the cake Mrs. Welty had baked she said "Oh, whose birthday is it?" and upon being informed it was Mrs. Kelsey's said "Oh, I wish I could have baked her a cake." She only remained up about half an hour.

The other witnesses in the case all testified to the fact that Mrs. O'Connor did at times have delusions, the only difference being as to the date when they first became known. Mrs. Mae Walker testified they were definitely noticeable the latter part of 1946 and became aggravated in early 1947. Other witnesses, except Engleman, placed them as beginning in the fall of 1947.

Mr. Bird stated that in May 1947 he talked to her about the Kelseys moving into her home but she was unable to make up her mind just what she should do and asked him to fix it as he thought it should be which he declined to do. He saw her again on December 7 or December 14 and she was talking about Judge O'Connor being in town and asked Mr. Bird to persuade him to come home. He stated in his opinion she was then incompetent to make a will. All of the other witnesses including Mae Walker,

except those mentioned above, testified to the same delusions and to her belief at times that her sister Nellie was still alive. Also at times she would be expecting guests and would go to great pains to set the table for them. One witness testified that she on at least one occasion stated there was some woman in the house trying to pass as her sister Nellie and on one occasion she thought there was a little girl in the automobile with her who soon disappeared. She accused one of the occupants of a room of taking food from her refrigerator and using it to entertain guests in his room and of taking other articles of food. She at times hid articles of food in various portions of the house and put her jewelry and trinkets away and forgot where she had put them. Both Virgil Walker, her nephew, and his wife Mae, testified they went to see Mrs. O'Connor December 14 or 15, 1947, when Mr. Bird was there and that she didn't know Virgil; that she did know Mae and they said, in their opinion, she was then mentally unsound.

The witness Engleman, to whom reference is made above, testified that, in his opinion, from January to the last of May 1947 deceased lived in a world of fantasy. He stated that when she was normal she told him of her close relationship with the Kelseys; about her sister Nellie who married Kelsey and that the home in which she lived once belonged to Nellie and Mr. Kelsey. She stated to him that both Judge O'Connor and she thought it would be nice to return the home to the Kelseys since the

O'Connors had no children and it was their desire and intention to do so. He said just before he left for his Christmas vacation on December 18 between seven and eight o'clock in the evening he had a conversation with Mrs. O'Connor; that he told her he was going home and would see his mother and she told him to tell his mother "Hello" for her. He said she then asked, "Are those men still here?" She would call for Mae, then he said she *might* begin to say a prayer like "Our Father who art in heaven, hallowed be Thy name." She would get that far and would repeat it, and then she *might* start talking numbers, 4, 7, 9, 11—just counting; that her mental condition was bad at that time. The facts stated unquestionably support the conclusion reached by him.

Most of the witnesses, all of whom were lay witnesses, testified concerning their opinion of her mental condition before and after December 16. Their opinions were based upon their observations of her conduct due to the delusions about which they testified in detail. Their opinions as to her mental capacity on those occasions were in conflict. The testimony concerning the nature of the delusions which possessed her mind at intervals and upon which these lay opinions were based, was not in conflict.

We have at the risk of undue length attempted to state with particularity the facts immediately surrounding the execution of the will on the morning of December 16, 1947. There is no dispute in the evidence concerning the fact that Mrs. O'Connor at times was laboring under delusions during the last few months of her life and they apparently possessed her mind more frequently as she approached the end of her life. The only conflict in that particular is as to the date the first delusion became manifest, which we consider immaterial.

We will first address our attention to the consideration of the mental capacity of deceased to execute the will in question on December 16, 1947. We said in In re Greene's Estate, 40 Ariz. 274, 11 P.2d 947, 948, in quoting from In re Perkins' Estate, 195 Cal. 699, 235 P. 45:

" 'It is well settled that, upon the contest of a will on the ground that the deceased was of unsound mind, the actual mental condition of the testatrix at the time of the execution of the will is the question to be determined. (Citing cases.) Evidence as to mental condition before or after the execution of the will is important only in so far as it tends to show mental condition at the time of the execution of the will. The presumption is always that a person is sane, and the burden is always upon the contestants of the will to show affirmatively, and by a preponderance of the evidence, that the testatrix was of unsound mind at the time of the execution of the will. (Citing cases.) * * *

" 'Every mental departure from the normal will not destroy a testamentary disposition, otherwise valid, of the tes-

tatrix's estate. It is not the rule of law that no person who is insane may make a valid will. The real rule is that the will of a person, who by reason of insanity is incapable of making valid testamentary disposition of his estate, shall not be upheld. (Citing cases.)

" 'Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) Insanity of such broad character as to establish mental incompetency generally; or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. Even in the latter class of cases, it is not sufficient merely to establish that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was the creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument. The evidence must establish, in addition to the fact of the existence of the hallucinations or delusions, the fact that by reason of these hallucinations or delusions the testatrix devised or bequeathed her property in a way which, except for the existence of such delusions, she would not have done. In short, the abnormality of mind must have had a direct influence upon the testamentary act. (Citing cases.)' "

As in In re Greene's Estate there is no testimony of insanity of deceased of such broad character as to establish mental incompetency generally. Her incompetency, therefore, if sustained, must rest upon the fact, if it be a fact, that the will she executed on December 16 was the creature or product of such delusions as are shown by the evidence to have possessed her mind at infrequent intervals. As above stated, we are concerned here with the actual mental condition of the testatrix on December 16 at the time of the execution of the will in question, at which time all witnesses present testified that she was calm, composed and knew what she was doing. We are concerned with evidence of her mental condition before and after that time only insofar as it tends to show her mental condition at the time she executed the will.

Regardless of opinions expressed by any witness concerning the mental condition of Mrs. O'Connor before or after the execution of the will and regardless of the opinions expressed by the attorney and subscribing witnesses concerning her mental capacity at the time she made the will, the conversation between her and the attorney and between her and Mrs. Macgregor about which there is no conflict speaks for itself, declaring, we think, in irrefutable language that during the period surrounding the reading, the discussion and the signing of the will with the exception of the momentary delusion concerning her sister Nellie, she was in full possession of all her men-

tal faculties. After the will had been executed she said she was glad she had done what she always wanted to do. She repeated that statement that evening to Mrs. Milliken who called to see her.

The belief at times that her husband or her sister Nellie were still alive certainly cannot be said to have influenced any of the terms of the testamentary instrument. In fact it negatives such influence. The natural consequence of such a belief would have been to make either one or both of such persons the subject of her bounty instead of devising her property to Kelsey. As further evidence that any delusions she may have had did not in any wise affect the disposition of her property is the fact that the will as executed conformed with her oft-repeated intention over a period of many years to return the property to Kelsey at her death. This is the very antithesis of the idea that by reason of such delusions she devised her property in a way, which, except for the existence of such delusions, she would not have done. It confirms her desire to carry out her intention expressed when her sanity was unquestioned. Her inability to remember where she had put her jewelry or other personal effects is not evidence of testamentary incapacity. The test is, (1) Did she at the time she executed the will, understand the nature of the act she was doing? (2) The nature or character of her property? (3) Her relation to the persons who had claims upon her bounty and whose interests are affected by the terms of the instrument? In re Sexton's Estate, 199 Cal. 759, 251 P. 778; In re De Graaf's Estate, 34 Cal.App.2d 120, 93 P.2d 199. We think it is clear from her conversation at the time that she did.

The record in this case is replete with the expressed intent of deceased from 1931 to the date of her death to dispose of the real property here involved in the manner provided for in the will. It shows a fixed state of mind over a period of years with respect to her plan for the disposition of such property from which she at no time deviated but on the contrary, executed the expressed purpose and intent in the language of the will itself. What could be more persuasive in establishing mental capacity to make a will than the execution of a plan conceived years ago and consistently adhered to until her death? We hold that the finding of the jury to the effect that deceased was without mental capacity to execute a will on December 16, 1948, is not supported by substantial evidence and there being no conflict on the material facts or opinions bearing upon this point as of December 16, 1947, we are not bound by such findings.

We now proceed to the second question. Did Kelsey exercise such influence over deceased in the making of her will that it had the effect of overpowering the will of the testatrix and substituting his will for hers? As we stated above we are convinced that there existed a fiduciary relation between Kelsey and deceased from 1933 until the date of her death in 1947. Kelsey was

active in the preparation of the will in that he conveyed to Mr. Barry, the attorney who drew the will, the information concerning what it should contain and particularly that he was to be the sole beneficiary. These two items when coupled together raise the legal presumption of undue influence. In re Hesse's Estate, 62 Ariz. 273, 157 P.2d 347. However this legal presumption was dissolved when Kelsey testified that he had not exercised any influence over the deceased concerning the disposition of her property. This is true even if neither the judge nor the jury believed the denial to be true. Silva v. Traver, 63 Ariz. 364, 162 P.2d 615.

 It would seem to follow that under our decisions when the presumption of undue influence has been dissolved, the burden then devolves upon the contestants to prove the existence of undue influence by a clear preponderance of the evidence. An examination of the authorities indicates the majority rule to be that when the presumption of undue influence once arises that the burden of proof then shifts to the proponents of the will to prove by the clear weight of evidence a lack of undue influence in its execution. We have held otherwise. We think this court made a sound and logical distinction between a legal presumption and an inference in Seiler v. Whiting, 52 Ariz. 542, 84 P.2d 452, and in pointing out that a legal presumption is not evidence; that the presumption completely vanishes upon the introduction of any evidence to the contrary. This rule has been enunciated by us in a number of cases. However, it is not necessary to apply it in this case for the reason that the absence of undue influence is established by clear and convincing evidence. The fact that Kelsey had the opportunity to exercise such influence over deceased is not sufficient to establish undue influence and to invalidate a will. In re Hull's Estate, 63 Cal.App.2d 135, 146 P.2d 242. As above stated there is no evidence tending to show that the will of deceased was overpowered and the will of Kelsey substituted in lieu thereof in the execution of the testamentary instrument disposing of the property of deceased. On the contrary the will carries out the previously and oft expressed intention of deceased to dispose of her property in this fashion. In re Stump's Estate, 202 Cal. 308, 260 P. 543. The court held that earlier testamentary writings of testatrix were evidence of a permanent and fixed state of mind regarding a plan to dispose of her estate and repudiates the charge of imposition of undue influence. To the same effect is In re Bacigalupi's Estate, 202 Cal. 450, 261 P. 470; and In re Easton's Estate, 140 Cal. App. 367, 35 P.2d 614. Oral declarations are equally admissible for that purpose. Had deceased over many years stated to all of her friends an intention to give her property to her nieces and nephews or to certain of them and had, under the circumstances here shown to exist, executed her will devising the property to Kelsey, then the inference of mental incapacity or.

undue influence would justify setting the will aside.

But the many repetitions of deceased to different people of her intent to dispose of the property as she did in the will, in our opinion, shows a permanent fixed mind to carry out the plan of both herself and Judge O'Connor to give their property to Kelsey upon their demise and the execution of the will in accordance therewith establishes not only a mental capacity to execute it but refutes any charge of undue influence in procuring its execution. The fact that Judge O'Connor was of the same mind as deceased does not, in our opinion, lend weight to the theory that in executing the will she was carrying out his wishes instead of her own. No one testified to any statement of deceased that Judge O'Connor ever communicated with her after his death or that she had ever seen him. The testimony is to the effect that deceased was a woman of law favors testamentary disposition of strong mind and not easily influenced. The property.

We conclude that there is no evidence to support the finding of the jury of undue influence in this case.

We will now take up the question involved in the second appeal. Appellant assigns but one error, i. e., that the superior court was without jurisdiction to appoint Virgil Walker administrator of the estate of Emma M. O'Connor, deceased, during the pendency of a contest respecting the probate of her purported will.

The will contest was tried to a jury as above stated and the issues found in favor of contestants. Thereupon the court, upon petition filed, appointed Virgil Walker general administrator of the estate of deceased. It was from that order of appointment that this appeal is prosecuted.

It is universally held that allegations and proof of intestacy is a condition precedent to the granting of general letters of administration. Section 38–401, A.C.A.1939, provides that administration of the estate of a person dying *intestate* shall be granted to someone or more of the persons named therein as being eligible. The power to appoint a general administrator of an estate is statutory. The statute limits such appointment to estates where deceased died intestate.

It was said in In re Davis' Estate, 11 Mont. 196, 28 P. 645, 648, relative to application for general letters of administration that:

"* * * By this proceeding the petitioner asks the court to ignore the fact that an instrument purporting and alleged to be the will of decedent is pending for probate subject to contest, and to entertain proof upon the question as to whether decedent left a will, and find that the proofs show that he died intestate, and grant letters of administration in advance of the determination of that question by the trial of the contest over said alleged will offered for probate. It is said by the su-

262

preme court of North Carolina in Slade v. Washburn, [25 N.C. 557] 3 Ired. 557, that such a proceeding while a paper purporting to be the will of decedent is before the court for probate, and a contest thereof is pending, involves an absurdity, and that an order appointing an administrator, 'made at the same moment when the court entertains a contest respecting the alleged will of decedent, and has an issue made up to try that contest,' must be held null and void. * * *"

Counsel contends that because no supersedeas bond was filed in the will contest matter that the court had jurisdiction to appoint administrator of the estate of deceased immediately, and that therefore the decision of the court in In re Orrantia's Estate, 36 Ariz. 311, 285 P. 266, has no application. We do not agree with this contention. The fact that an appeal was taken and the proceedings in that case were not stayed by filing a supersedeas bond does not alter the fact that contest proceedings were still pending. The judgment of the trial court was not final. A determination of the validity of the will of deceased will become final only when the mandate of this court goes down determining its validity or invalidity.

It was said in Dinwiddie v. Shipman, 183 Ind. 82, 108 N.E. 228, 229, that:

"The judgment of the circuit court in a suit to contest a will does not put an end to the contest where there is an appeal. Our statute provides that an appeal may be taken by any person affected by the proceedings, and it has been held that an executor appointed under a will has such an interest in upholding it as makes him a necessary party on appeal. (Citing case.) During the pendency of the appeal he may prosecute or defend in his representative capacity, and, in case the will is ultimately sustained, he may execute his trust under the original appointment as executor. The judgment of a circuit court setting aside a will does not necessarily, operate to set aside the appointment of an executor previously made under such will. He may appeal, and in so doing acts in his representative capacity; but, pending such appeal, his powers to further administer the estate under the terms of the will are suspended. If the will is finally sustained, such powers are revived, but in case it is finally set aside such powers are terminated."

There are only a few cases in the books on this subject but the tenor of all of them seems to be that the appointment of a general administrator during the pendency of a will contest, that is, before its final determination is null and void. Poffinbarger v. Sumner, 186 Ind. 597, 117 N.E. 646; Schouler's Executors and Administrators, 2d ed., section 91; In re Guye's Estate, 54 Wash. 264, 103 P. 25. To the same effect is In re Edwards' Estate, 154 Cal. 91, 97 P. 23, 24.

This is but the expression of a fundamental principle of law.

We therefore hold that the order issuing letters of general administration of the estate of Emma O'Connor deceased to Virgil Walker under the circumstances was and is null and void. The judgment of the trial court is reversed and the cause remanded with directions to set aside its order directing letters of general administration to issue to Virgil Walker; that the letters of general administration be vacated and the will of deceased be admitted to probate.

Judgment reversed, with directions.

UDALL, C. J., and STANFORD, J., concur.

LA PRADE, Justice (dissenting in part, concurring in part).

I concur in the disposition of the "second appeal".

I cannot agree with the evaluation of the testimony in this case made by the majority in the "first appeal", and therefore I dissent in the disposition made of this appeal and directing that the will be admitted to probate. If there is any rule of law that this court presumably adheres to it is that the judgment of the trial court, based on the verdict of a jury, will not be disturbed on appeal if there is any reasonable evidence in the record to sustain it. Valley Nat. Bank of Phoenix v. Carrow, 71 Ariz. 87, 223 P.2d 912; Chester v. Chester, 69 Ariz. 104, 210 P.2d 331.

Another hard and fast rule is that in reviewing a judgment of the trial court, based on a verdict of the jury, the evidence will be viewed by this court in the strongest manner in behalf of the prevailing party. A few of the cases announcing this ruling are: Robles v. Preciado, 52 Ariz. 113, 79 P.2d 504; Salt River Valley Water Users' Ass'n v. Cornum, 49 Ariz. 1, 63 P.2d 639; Musgrave v. Southern Pacific Co., 49 Ariz. 512, 68 P.2d 202.

In the case of Ghiz v. Millett, 71 Ariz. 161, 224 P.2d 650, 651, we stated:

"This court may not weigh evidence to determine its preponderance upon a disputed question of fact, but is concerned only with whether facts do exist which might reasonably support the judgment, and if they do, the judgment must be sustained. Dunseath v. Tucson Golf & Country Club, 51 Ariz. 14, 74 P.2d 43; Painter v. Freije, 65 Ariz. 153, 176 P.2d 690; Hillman v. Busselle, 66 Ariz. 139, 185 P.2d 311." For additional cases see 2 Arizona Digest, Appeal and Error, ☞ 1002.

It is also a well-settled rule in this jurisdiction that the judgment and verdict must be upheld when based upon competent testimony or upon reasonable inferences to be drawn from testimony of probative facts. Atchison, T. & S. F. Ry. Co. v. Hicks, 64 Ariz. 15, 165 P.2d 167, 172. In this case Justice Morgan, speaking for the court, said:

"We might have come to a different conclusion, but this court and the trial court where the case was submitted to the jury are not the triers of the facts."

The foregoing rules are elementary and have been stated and restated. There is no occasion to restate the reasons back of these rules for we have decided hundreds of cases wherein the reasons for the rules have been expounded at length. On June 30, 1952, this court, in the case of Wilson v. Flaccus, 74 Ariz. 197, 245 P.2d 962, which involved a judgment founded on contradictory evidence, stated:

"This court has said times without number that the trial court who had the opportunity to see, listen and gauge the demeanor of the witnesses on the stand is the best judge of conflicting testimony."

As far as I am concerned a litigant has nothing to gain and will gain nothing by an appeal to this court from a verdict and judgment based on contradictory testimony and reasonably supported by the testimony, unless the same is physically impossible or patently untrue. Motors Ins. Corp. v. Rhoton, 72 Ariz. 416, 236 P.2d 739. The difference of opinion of the judges in this case arises not from the law and rules applicable but from an evaluation of the testimony.

Two interrogatories were submitted to the jury. They are, first, "At the time the will was made was Emma M. O'Connor of unsound and undisposing mind and mentally incapable of making a will?" The answer was yes. The second interrogatory reads, "Was the execution of said purported will procured through undue influence exercised over the testatrix, Emma M. O'Connor, by the defendant, Harry W. Kelsey, or anyone acting in consent with him?" The answer was yes. The jury unanimously concurred on each of the interrogatories. The judgment of the trial court set the will aside and adjudged that (1) Emma M. O'Connor was of unsound and undisposing mind and mentally incapable of making a will, and (2) the execution of the will was procured by undue influence exercised by the opponent of the will and the sole beneficiary thereunder.

Is there any testimony in the record that reasonably tends to support the verdict and judgment, that is reasonably sufficient to support the verdict and judgment? If there is, under the oft-repeated statements of this court the verdict and judgment must be sustained. The majority say, "There is no testimony of insanity of deceased of such broad character as to establish mental incompetence generally." The jury and the trial judge said there was.

Now let us look at just some of the factual situation that was developed before the jury. The will was made on December 16, 1947. At that time Mrs. O'Connor was approximately 80 years of age and had physically wasted away to practically nothing, less than 100 lbs. (in health she was a large woman). She was bedridden and had

been since the early part of December, 1947. There was evidence from witnesses with whom she had been intimately associated that for many months prior thereto she was incapable of attending to any business or entering into any contract or agreement or writing a will. For months prior to the execution of the will she had been suffering from delusions and hallucinations. Two days before she executed the will she did not recognize her nephew, Virgil Walker, with whom she was well acquainted. She had to be told who he was. One of the witnesses, peculiarly fitted to know whereof she spoke, testified that for some time prior to the making of the will she had the mind of and acted like a baby, cried like a baby and wanted to be petted, and she was totally incompetent to execute business of any kind and in the opinion of the witness had no sufficient mind to make a will.

Within a few minutes after executing the will, as reported in the majority opinion, she suffered and experienced one of her numerous delusions about her dead husband being present.

This case was tried in Nogales, Arizona, the home of Mrs. O'Connor. Her long-time friend and legal counsel, Mr. Duane Bird, had interviewed her two days before this will was made. He declined to draw a will for her and testified that in his judgment she was incompetent to make a will. He appeared as a witness, and his general reputation for honesty and integrity and his character were well known to all of the jurors.

I am not saying that the jury reached the right verdict or that the judgment based on the verdict should have been reached. Nor did the jury by its verdict or the court by its judgment find that the property was not justly and equitably disposed of by the will. But it did find that at the time the will was executed Mrs. O'Connor was mentally incompetent to make any will and that she had been subjected to undue influence.

In view of all the circumstances the jury was entitled to draw the reasonable inference that Mr. Kelsey was bent on having the will drawn. Not being able to secure the services of Mr. Bird, Mrs. O'Connor's friend and counsellor, he secured the services of Mr. Barry. Mr. Barry drew the will without first interviewing the testatrix and the will contained the terms "dictated by Mr. Kelsey". The attesting witnesses were secured by Mr. Kelsey.

Now let us see what happened moments before the actual signing of the will. Mr. Barry testified that Mrs. O'Connor read the will aloud. He said:

"* * * I told her that Mr. Kelsey had informed me she wanted to make a will and he stated she was to leave everything to him, and I asked her if she could read it, that I had the will with me, and she took the will and she looked at it, and said, 'Do you want me to read it aloud?' and I said, 'Yes, that

would be a good idea,' and she began to read it clearly and distinctly. I was rather surprised she could read so well, and she began to read until she came down to the first clause, and she halted after reading it.

"Q. Will you read the first clause so that the jury will know? A. (Reads) 'Having in mind that my deceased husband William A. O'Connor, on many occasions expressed a wish that at the time of my death all property then owned by me should go to Harry W. Kelsey, who was the husband of my deceased sister, Nellie Walker Kelsey, and who has always been kind and good to me, I give, devise and bequeath all that I die possessed of to said Harry W. Kelsey.'

"Q. What did she say after she read that? A. She stopped when she came to that clause which referred to the leaving of the property to Harry Kelsey and said, *'I don't understand that. I don't remember that.* You know I have a sister Nellie.' And then I said to her, 'Don't you know that your sister Nellie has been dead for many years?' And she said, 'No, I do not.' I said, 'Oh yes, she has. I can get her death certificate for you from *Phoenix in a few days.'* She said, 'But I don't want to put you to that trouble.' I said, 'Don't you remember she had an unusual disease called pellagra, and that she died many years ago?' and she said, 'Yes, I

think I remember now. She was the wife of Harry W. Kelsey, as it says here. Ever since the death of Mr. O'Connor, Mr. Kelsey has been like a brother to me. I remember now Mr. O'Connor said everything should go to Mr. Kelsey because we owed a lot to him. He was very good to us. My husband said it would not amount to much, anyway.' "

I propound these questions: might not the jury reasonably have believed the witness when he testified the testatrix said she "didn't understand" the phrase that gave her property to Harry Kelsey and believed that the answer represented the true state of mind of the testatrix? At that very moment the testatrix did not remember that her deceased sister, Nellie, had been dead for many years. The witness, Mr. Barry, had to argue with her and convince her of the fact that her sister was dead, and he offered to prove it and to get a death certificate for her. Mr. Barry then testified that he said to the testatrix:

"I certainly would not want to influence his widow to do anything she didn't want to do. Now you can keep this will and read it over, and if it is not what you want to do, don't sign it, but while I don't want to urge you to make your will I would suggest that you do so. If this will is not satisfactory, tell me what you want, to whom you wish your property to go, or call in

some other lawyer and have him prepare a will according to your wishes."

What was the response? She said, "I don't understand anything about business. My husband always took care of anything." Isn't it a reasonable inference that at that moment Mr. Barry was "up a stump"? What did he do or say? He asked Mrs. O'Connor, "Do you want to talk to Harry?" *He did not wait for an answer* but went out of the room and got Mr. Kelsey to go in and talk to her.

According to Mr. Barry, Mr. Kelsey went in, closed the door and stayed closeted alone with Mrs. O'Connor for *ten minutes*. Mr. Kelsey had been her long-time friend and confidant and the only man who could direct her or get her to comply with his wishes or the wishes of her friends. The evidence was that his *presence alone* was always sufficient to secure compliance from Mrs. O'Connor. What happened when Mr. Kelsey locked himself up in the room with Mrs. O'Connor? No one knows but Mr. Kelsey. He testified she had the will in her hand and she said, "Do you want me to sign this?" and he said, "Emma, have you read it?" She said, "Yes," and he said, "Go ahead and sign it." He did *not* testify that the testatrix said, "I want to sign it." The testatrix said, "Do you want me to sign it?" and then he said, "Yes."

Mr. Kelsey was the *sole beneficiary* of the will. Contrary to the statements of the majority opinion the disposition of the property is not in compliance with all of her so-called "oft and many-times-repeated desire", the testimony from some of the witnesses being that the testatrix had often said that she was going to leave the property to "Kelse and Edith" (being Mr. Kelsey and his wife, Edith). Mr. Kelsey dictated the terms of the will and neglected or on purpose left out his wife. By the terms of the will the property therein demised became his separate property.

The will further did not carry out the "oft-repeated" intentions of Mrs. O'Connor. From the witnesses it appears that Mrs. O'Connor had stated many times that she wanted Mrs. Milliken to distribute to some of her friends such articles as an old picture, an old vase and an old relic. Mrs. O'Connor repeatedly said she was going to leave a $1,000 bond to her niece, Mae Walker; that she wanted Mae Walker to have some of her personal things; that she wanted a diamond ring to go to Madeline Kelsey; that Virgie Walker was to have a certain ring and that Mrs. Milliken was to have certain pieces of her personal effects.

It does not occur to me that the majority opinion is bolstered in the least by saying that the executed will accomplishes what Mrs. O'Connor had always intended. According to the testimony the will does not fully accomplish what she intended. In any event this argument is all beside the point. The question is, did the testatrix have testamentary capacity at the time she executed the will, and, is the will the product of un-

due influence exerted upon the mind of the testatrix?

I am of the opinion that there was ample testimony, as I evaluate it, from which the jury and judge could have concluded that Mrs. O'Connor was without testamentary capacity and had been subjected to undue influence. It is not the province of this court to weigh the evidence to determine its preponderance upon disputed questions of fact. Its only concern is whether evidentiary facts do exist which might reasonably support the judgment, and if they do the judgment must be sustained; that is, if we are to follow the oft-repeated rule of this court, for different inferences as to the ultimate facts may be drawn from evidential facts and inferences drawn by the trial court must be accepted by the Supreme Court of Appeal. Daily Mines Company v. Control Mines, Inc., 59 Ariz. 138, 124 P.2d 324; Kenton v. Wood, 56 Ariz. 325, 107 P.2d 380.

Mr. Kelsey testified at length and his appearance, demeanor, attitude and desires were fully gone into and subjected to inquiry. Did the jury put any credence in testimony that he believed Mrs. O'Connor was of sound and disposing mind? The Hon. Judge Gordon Farley, Judge of the Superior Court of Santa Cruz County, Arizona, testified that during the summer of 1947 Mr. Kelsey came to him and wanted him to use his influence with Virgil Walker (nephew of Mrs. O'Connor) to persuade Virgil to get the members of the Walker family to make a *contract* of some kind with him so he would get the O'Connor home. The Judge further testified, "I queried him as to why he didn't negotiate directly with Mrs. O'Connor about it, *and he stated to me at that time* that she was *not competent to make any arrangement*".

The Kelseys moved in with Mrs. O'Connor during the last week in August, 1947, and subsequent to this event Mr. Kelsey again went to Judge Farley and discussed with the Judge the possibility of having a guardian appointed for Mrs. O'Connor. At this time he told the Judge that Mrs. O'Connor was mentally incompetent and unable to take care of her affairs herself. Mind you, this was four months before the will was executed and from which time Mrs. O'Connor continued rapidly to fail physically and mentally. Judge Farley further testified that at this conversation Mr. Kelsey requested him to use his influence to keep Gladys Cameron (niece of Mrs. O'Connor) from visting Mrs. O'Connor, his reasons being that she aggravated Mrs. O'Connor and, quoting Kelsey, "Mrs. O'Connor was not competent" and he "gestured in this manner (indicates)" indicating, as he supposed, that she had loose wheels in her head.

The effect of the prevailing majority opinion is that contestants failed to make a case to go to the jury; that the trial judge was in error in failing to recognize this

want of proof; and was also in error in not rendering judgment for the proponent of the will and admitting it to probate.

As I evaluate the legal sufficiency of the evidence to sustain the verdict and judgment, it was more than ample. Viewing the legal sufficiency of the evidence as I do, I am of the opinion that the judgment of the trial court should be sustained.

DE CONCINI, J., joins in Judge LA PRADE'S dissent.